**UNITED STATES of America, Appellee,**

v.

**Ralph F. DeLEO, Defendant, Appellant.**

**No. 7356.**

United States Court of Appeals First Circuit.

Jan. 21, 1970.

Certiorari Denied April 20, 1970. See 90 S.Ct. 1355.

Paul T. Smith, Boston, Mass., with whom Manuel Katz, Boston, Mass., was on brief, for appellant.

Edward J. Lee, Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on the brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

This case involves a federal bank robbery, with indictments under 18 U.S.C. § 2113(a) and (d) leading to conviction after jury trial. A spirited and able defense has raised a number of issues, none of which we feel is adequate to command reversal. The facts are best marshalled in connection with each issue.

I

The first issue, raised by a motion to dismiss, is whether the indictment was fatally defective for failure to allege that the forceful and violent taking of a bank's money, by intimidation and by putting the lives of various persons in jeopardy, had been done knowingly and with felonious intent. Appellant argues that the crime is of the common law larceny genus and thus an essential element of allegation and proof is felonious intent, even though such requirement is not expressed in the statute.[1]

The offense described in the first paragraph of section 2113(a)—"analogous" to common law robbery, Prince v. United States, 352 U.S. 322, 324, 77 S.Ct. 403, 1 L.Ed.2d 370 n. 2 (1957), or "in the nature of robbery", Rawls v. United States, 162 F.2d 798, 799 (10th Cir. 1947)—is part of the statutory pattern to protect institutions whose deposits are federally insured. Six specific crimes are set out in section 2113. Felonious intent is specifically incorporated in the definition of two of them: entering a federally insured institution with intent to commit a felony (a—second paragraph), and taking property with intent to steal or purloin (b). However, it is not made part of the crimes of taking by force and violence or by intimidation (a—first paragraph); knowingly receiving stolen property (c); assaulting or putting in jeopardy the life of a person by a dangerous weapon (d); or killing a person, or forcing a person to accompany him, while in the course of committing one of the other offenses or avoiding apprehension or confinement for any of them (e).

This differentiation shows careful draftsmanship. Entering and taking can be innocent acts, and therefore require felonious intent to constitute crimes[2];

---

1. 18 U.S.C. § 2113 provides, in relevant part,

"(a) Whoever, by force and violence, or by intimidation, takes * * * from the person or presence of another any property or money or any other thing of value belonging to * * * any bank * * * shall be fined * * * or imprisoned * * *.

* * * * *

"(d) Whoever, in committing * * * any offense defined in subsections (a) and (b) * * * puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined * * * or imprisoned * * *."

2. As the Court stated in Prince v. United States, 352 U.S. 322, 328, 77 S.Ct. 403, 407, 1 L.Ed.2d 370 (1957): "The gravamen of the offense is not in the act of entering, which satisfies the terms of the statute even if it is simply walking through an open, public door during normal business hours [footnote omitted]. Rather the heart of the crime is the intent to steal."

receiving stolen property can be innocent, unless done knowingly. However, the other offenses describe acts which, when performed, are so unambiguously dangerous to others that the requisite mental element is necessarily implicit in the description.[3] *Contra:* United States v. Margeson, Cr. No. 64–26 (D.Me.1964). It therefore is immaterial for sections 2113(a) and (d) whether the subjective intent of a bank robber is to steal that to which he has no claim or to recover his own deposit; the crime is his resort to force and violence, or intimidation, in the presence of another person to accomplish his purposes. United States v. Lester, 287 F.Supp. 870 (E.D.Pa.1967), aff'd. 399 F.2d 161 (3d Cir. 1968); Pitman v. United States, 380 F.2d 368 (9th Cir. 1967).

## II

A second issue is directed to the admission in evidence of the incriminating contents of appellant's safe deposit box. Appellant was arrested under the authority of a warrant at 9:30 p. m. on September 29, 1966, the day after the bank robbery. The arrest took place in a drug store, on which occasion an F.B.I. agent searched appellant for a weapon.

No question is raised concerning the arrest or this search. Forty minutes later, at local F.B.I. headquarters, agents again searched appellant and found a bank safe deposit envelope and signature card, bearing the date of the day, September 29, and a key. These led to information from a vault attendant in the specified bank that appellant had, on the morning following the robbery, rented a safe deposit box in the bank and had "put something heavy" into it. A search warrant based on this information was issued and under its authority agents opened the box, finding a gun and sunglasses later introduced at the trial over objection and identified as those wielded and worn by appellant during the robbery.

Appellant argues that the search at F.B.I. headquarters was too remote in time and place to be incident to his arrest; that there was no probable cause to seize the envelope, card, and key; and that there was no probable cause for the issuance of the search warrant.

Concerning the propriety of the search, appellant properly recognizes the ominous relevance of such cases as United States v. Frankenberry, 387 F.2d 337 (2d Cir. 1967); Malone v. Crouse, 380

---

Moreover, taking seemingly abandoned property from a government bombing range in the hinterland, Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), or taking one's property from customs control and custody, thinking that the necessary papers had been completed, Hughes v. United States, 338 F.2d 651 (1st Cir. 1964), rehearing denied, 340 F.2d 609 (1965), are not criminal in the absence of felonious intent.

The frequent citation of *Morissette* and *Hughes*, as boiler-plate mandates for allegations or proof of specific felonious intent in all sorts of irrelevant situations evidences either a widespread misunderstanding of the narrow questions there involved or the adherence of the bar to the principle that hope endureth forever.

3. We are fortified in our view by the approving reference of the Court in Prince v. United States, *supra* 352 U.S. at 326, 77 S.Ct. at 405, to the language of the Attorney General in his letter proposing

amendments in 1937 to the Bank Robbery Act. He cited the anomalous case, then beyond the reach of the Act, of a man who had succeeded in gaining possession of the bank's funds during the absence of an employee and "without displaying any force or violence and without putting anyone in fear—necessary elements of the crime of robbery * * *." While the Attorney General did not say these were all the elements of the federal crime of robbery described in section 2113(a), we think that all were specified in his example: the taking of funds in the custody of a federally insured bank, the use of force or violence, or intimidation, in the presence of some person.

See also Portnoy v. United States, 316 F.2d 486 (1st Cir. 1963), cert. denied, 375 U.S. 815, 84 S.Ct. 48, 11 L.Ed. 2d 50 (1963), in which we upheld an indictment where the allegation of the requisite mental element was implicit in the indictment.

F.2d 741 (10th Cir. 1967), cert. denied, 390 U.S. 968, 88 S.Ct. 1082, 19 L.Ed.2d 1174 (1968); Cotton v. United States, 371 F.2d 385 (9th Cir. 1967); and Grillo v. United States, 336 F.2d 211 (1st Cir. 1964), cert. denied, 379 U.S. 971, 85 S. Ct. 669, 13 L.Ed.2d 563 (1965). We would add United States v. Caruso, 358 F.2d 184 (2d Cir. 1966), cert. denied, 385 U.S. 862, 87 S.Ct. 116, 17 L.Ed.2d 88 (1966); Rodgers v. United States, 362 F.2d 358 (8th Cir. 1966), cert. denied, 385 U.S. 993, 87 S.Ct. 608, 17 L.Ed.2d 454 (1966); Charles v. United States, 278 F.2d 386, 389 n. 2 (9th Cir. 1960), cert. denied, 364 U.S. 831, 81 S.Ct. 46, 5 L.Ed.2d 59 (1960); and Baskerville v. United States, 227 F.2d 454 (10th Cir. 1955).

Appellant asserts, however, that the teaching of these cases has been overruled by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), which he further asserts is the first occasion the Court has had to consider whether a search at a police station following an earlier arrest is valid. He points to Beck v. Ohio, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964), where the Court merely proceeded "on the premise that, if the arrest itself was lawful, [permissible] limits were not exceeded" by such a search. We recognize that the range of Fourth Amendment cases and the pertinent language of the Court, from Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), to Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), have generally dealt with searches of cars, rooms, offices, and homes, but not of a person shortly after being arrested and conducted to a police station. Nevertheless, the Court was, in Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960), required to deal

with a search of an alien after being arrested and taken to Immigration and Naturalization Service headquarters. The Court, speaking through Mr. Justice Frankfurter, said, at p. 239, 80 S.Ct. at p. 697:

"The property taken by petitioner to I.N.S. headquarters was all property which, under *Harris*, was subject to search at the place of arrest. We do not think it significantly different, when the accused decides to take the property with him, for the search of it to occur instead at the first place of detention when the accused arrives there, especially as the search of property carried by an accused to the place of detention had additional justifications, similar to those which justify a search of the person of one who is arrested."

Although four Justices dissented vigorously from the major holding validating a search of petitioner's hotel room, not one commented on the holding to which the above quoted language refers.

We disagree that Chimel v. California, *supra,* has overruled these cases. We are disinclined to read *Chimel* as teaching new doctrine on the subject of search of an accused shortly after his arrest at the first place of detention; the rationale of *Chimel* does not require its extension to cases like that at bar, for the evil sought to be rooted out is not present.

We read *Chimel* as being acutely concerned about the increasing legitimation of wide-ranging warrantless searches of lodgings and buildings based on the fortuity of arrest on the premises, which had been ushered in by United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950).[4] That search of the person was not the evil addressed is apparent from the early references in

---

4. Such concern was common to all of the cases held pending the disposition of *Chimel* and disposed of the same day: Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728; Shipley v. California, 395 U.S. 818, 89 S.Ct. 2053, 23 L.Ed.2d 732; Schmear v. Gagnon, 395 U.S. 978, 89 S.Ct. 2125, 23 L.Ed.2d 767; Harris v. Illinois, 395 U.S. 985, 89 S.Ct. 2137, 23 L.Ed.2d 774; Mahoney v. LaVallee, 395 U.S. 985, 89 S.Ct. 2137, 23 L.Ed.2d 774; Chrisman v. California, 395 U.S. 985, 89 S.Ct. 2135, 23 L.Ed.2d 774; Jamison v. United States, 395 U.S. 986, 89 S.Ct. 2135, 23 L.Ed.2d 774.

*Chimel,* distinguishing Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), and from the Court's own language 395 U.S. at 766, 89 S.Ct. at 2042: "The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other."

█ The difference between the situation in *Chimel* and that in the case before us is this: the arrest of a suspect in a particular place—be it his apartment, office, or house—has no such nexus with that place as, without more (i. e., a valid search warrant), would justify searching the premises; but the fact that a suspect, arrested in a public place, has been subjected only to a hasty search for obvious weapons has a reasonable nexus with the necessity of conducting a more deliberate search for weapons or evidence just as soon as he is in a place where such a search can be performed with thoroughness and without public embarrassment to him.[5] *See* 395 U.S. at 762–763, 89 S.Ct. 2034. While the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence.[6] Were this not to be so, every person arrested for a serious crime would be subjected to thorough and possibly humiliating search where and when apprehended. See United States v. Caruso, *supra* 358 F.2d at 185–186. We see no constitutional mandate for such a practice.

When, at F.B.I. headquarters, agents discovered a safe deposit envelope, key, and card evidencing the renting of a box the morning after the robbery by the 25 year old appellant who had already been arrested under warrant and had been identified as one of the robbers, they had, to use the words of the Court in Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967), "cause to believe that the evidence sought [would] aid in a particular * * * conviction." While in Warden v. Hayden the clothes found in the washing machine could lead the police reasonably to believe that they "would aid in the identification of the culprit", 387 U.S. at 307, 87 S.Ct. at 1650, the evidence here of the newly rented safe deposit box could lead the F.B.I. reasonably to believe that it would reveal the loot or the instruments of the crime.

█ Appellant's attack on the validity of the affidavit is without merit because discovery of the recent renting of the safety deposit box was set forth in the affidavit for a warrant to search the box. The additional information in the affidavit concerning the bank vault attendant's recollection of appellant's renting the box, being reliable in our view, only strengthens the already valid affidavit.

### III

Appellant makes a more impressive argument that his Sixth Amendment right to a speedy trial was violated. Appellant was arrested on September 29, 1966, one day after the robbery; the first indictment was issued on October 11, 1966. However, trial did not take place until March 18, 1969, some twenty-nine months later. In the interim, no fewer than eleven continuances were sought by the government. Counsel for appellant asserts, without contradiction, that on each instance he was ready to

---

5. This difference is pointed up in Barnett v. United States, 384 F.2d 848 (5th Cir. 1967), where a warrantless search of the arrestees' car, in the custody of the police, within an hour of the arrest was held invalid, but no error was found in the search of the two suspects on their arrival at the county jail.

6. Compare Brett v. United States, 412 F.2d 401 (5th Cir. 1969), where a search of a prisoner's clothing three days after his arrest was held invalid. *But see* dissenting opinion of Aldrich, J.

proceed with hearings on motions; that on the occasions when trial had been set, appellant was ready; that on no occasion was he consulted in advance of the decision. Not only the length of the post-indictment period but the large number of continuances sought by the government force us to scrutinize carefully the government's conduct during this period and the effect of the delay on appellant.

■ Appellant would have us forego such scrutiny and rule that the mere passage of time in this case—being so much longer than that held permissible in Fleming v. United States, 378 F.2d 502 (1st Cir. 1967) (11 months after indictment), and Carroll v. United States, 392 F.2d 185 (1st Cir. 1968) (10 months before arraignment)—was in itself enough to constitute a denial of his Sixth Amendment right to a speedy trial. No authorities are cited for this proposition except various state statutes and the normative goal proposed by the President's Commission on Law Enforcement and Administration of Justice of four months from arrest to trial. The Challenge of Crime in a Free Society, p. 155, 1967. We reject any per se approach to this aspect of the Sixth Amendment. See United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); United States v. Mancusi, 412 F.2d 88, 90 (2d Cir. 1969).

■ In our review of the federal cases, we have found occasional references to a rule that after some period of time, prejudice to the defendant will be presumed and it becomes the government's burden to show that no prejudice to the defendant arose from the delay. Pitts v. North Carolina, 395 F.2d 182, 184–185 (4th Cir. 1968); Smith v. United States, 418 F.2d 1120 (D.C.Cir. 1969); see United States v. Lustman, 258 F.2d 475, 477–478 (2d Cir. 1958), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed. 2d 109 (1958). Having read these cases, as well as United States v. Ewell, supra, Klopfer v. North Carolina, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), and Smith v. Hooey, 393 U.S. 374, 89 S.Ct.

575, 21 L.Ed.2d 607 (1969), we are not persuaded that a presumption of prejudice arising from the mere passage of time is either prevailing doctrine or the most effective way fully to assure the Sixth Amendment's speedy trial. Given the panoply of circumstances which can arise between crime and trial, we prefer to give close scrutiny to the three factors discussed in Ewell, supra, 383 U.S. at 122–123, 86 S.Ct. 773; length of delay, effect thereof on defendant before and at trial, and nature of the government's conduct in prosecuting the case.

Appellant's major argument is that "the delay of almost 30 months was improperly motivated and was occasioned by purposeful and oppressive action on the part of the Government." Clearly, such improperly motivated delay would constitute a denial of speedy trial. Pollard v. United States, 352 U.S. 354, 361–362, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957), and cases cited therein; Ewell, supra 383 U.S. at 123, 86 S.Ct. 773; see Klopfer, supra. However, we do not think such approbrium appropriate here.

■ Without attempting a full chronological explanation of the proceedings, we can account for most of the delay by the following occurrences: preparation time for defense, government continuances, a second grand jury indictment charging appellant and additional defendants, unavailability of government witness, hearings on defendant's motions, misunderstanding between counsel and trial judge, illness of government attorneys, more hearings on motions, a mistrial, the conversion to a new federal jury selection system, and the involvement of the trial judge with two other substantial cases, all of which were interspersed with periods of inaction by counsel on both sides and by the court. Of all the delays, only one period—for some 2 weeks in late March 1967—can, in our view, be attributed to deliberate government stalling, motivated apparently by an effort to obtain evidence from an alleged co-conspirator of appellant on which to found the new indictment. We

do not deem such two-week delay to constitute the kind of culpable delay which denies a speedy trial. Epperson v. United States, 125 U.S.App.D.C. 303, 371 F.2d 956, 957 (1967). The other aspects of the delay were either for the most part justifiable or attributable to a lack of diligence by government counsel, unfortunate, but by no means improperly motivated.

Moreover, the effect of the delay on appellant was not even alleged to be adverse. There was no incarceration prior to trial, appellant being free on bail; his reputation during this period may have been tinted by the pending prosecution in this case, but was dyed increasingly darker by arrests for unrelated crimes in other jurisdictions in May and August of 1967 and in early 1968; and there is no evidence that appellant's ability to defend himself had been impaired by the delay. Elwell, supra 383 U.S. at 120, 122, 86 S.Ct. 773. There was no allegation or evidence of the less tangible manifestations of prejudice referred to in Klopfer, supra 386 U.S. at 222, 87 S.Ct. 988. On inquiry during oral argument, counsel asserted two grounds for prejudice, neither of which significantly delayed trial and both of which simply went to the collection of evidence by both sides. That the evidence acquired may not have been to defendant's liking is no basis for claiming a denial of speedy trial.

█ We therefore hold that while the period between indictment and trial was unfortunately lengthy, there was no improper governmental motive behind it, no discernible hardship imposed on appellant in the interim, and no interference with the fairness of the trial which appellant ultimately had. The Sixth Amendment's speedy trial was not denied here.

█ Concerning appellant's argument that there was "unnecessary delay in bringing defendant to trial" within the meaning of Rule 48(b),[7] F.R. Crim.P., we agree that that Rule imposes a more stringent standard than the Sixth Amendment. United States v. Cartano, 420 F.2d 362 (1st Cir. 1970); United States v. Mark II Electronics of Louisiana, 283 F.Supp. 280, 281–284 (E.D.La.1968); 8A Moore's Federal Practice, ¶ 48.03[1]. As the Committee Note to Rule 48 states, part (b) "is a restatement of the inherent power of the court to dismiss a case for want of prosecution." 8A Moore's Federal Practice, ¶ 48.01[2]. Accordingly, the trial court's disposition of a Rule 48(b) motion will only be reversed for an abuse of discretion. United States v. Cartano, supra 420 at 363; Hodges v. United States, 408 F.2d 543, 551 (8th Cir. 1969). As we have indicated above, only a part of the pre-trial delay is clearly attributable to government inaction; although this may have been avoidable, it does not appear that it was inexcusable. Appellant failed even to allege that he was prejudiced by the delay, during all of which he was free on bail. On this record, we cannot say that the district court abused its discretion in denying the Rule 48(b) motion.

We are, however, prompted to comment on the government's explanation that a portion of the delay is attributable to the trial judge's involvement with two other complicated criminal cases during a portion of the time in question here. This problem arises not at all from a lack of conscientiousness on the part of the judge but from the method employed in the District of Massachusetts whereby a judge stays with a case from assignment to final disposition. Our comment is addressed to the problem of harmonizing this system with the need to insure that some cases do not receive low priority treatment because of the burdens facing that judge. We can do no better than cite the admonition of the Eighth

---

7. Appellant's only written motion to the trial court in this regard related to the Sixth Amendment. The colloquy between the counsel and the judge was confusing on this point but it does appear that the district court treated appellant's objection as encompassing a Rule 48(b) motion.

Circuit in Hodges v. United States, *supra* at 551–552:

> "Where a multiple-judge court uses the individual calendar system, all judges must share responsibility for the prompt disposition of criminal cases, must employ a team approach to those cases, and, when necessary, must reassign them in order that they may be tried according to the commands of the Sixth Amendment and Criminal Rules 48(b) and 50. If a judge is otherwise long committed in another case or is delayed in getting to the criminal cases on his calendar by reason of illness, personal misfortune or press of other business, this obviously does not serve to toll the enforcement of the right of a defendant awaiting trial on that judge's criminal calendar."

██ We refrain from saying that "a team approach" is the only mechanism possible; it may well be that one judge could be assigned the responsibility of surveying the calendar. The important point is that there must be some central supervision over crowded dockets in multi-judge courts utilizing the individual calendar system,[8] or that, at a minimum, there be a recognized collective obligation to respond to the self-generated action of the judge whose docket, particularly whose criminal docket, is in arrears. The advantages of the individual calendar cannot justify rigid adherence to that system at the expense of the rights of individual litigants.

### IV

Appellant, in support of his dismissal motion addressed to lack of a speedy trial, offered to prove that his indictment had been procured by perjured testimony from a co-defendant and that the same co-defendant had reported to the F.B.I. appellant's defense strategy—all part of a cat-and-mouse game being played by the co-defendant in seeking favorable disposition of other prosecutions. These allegations became part of a separate effort to dismiss the indictment.

██ As for the alleged activity of the co-defendant in serving as a double agent, appellant has made little of this, apart from his argument that the desire of the government so to use the co-defendant contributed to the delay. Even if the government did prevail on the co-defendant to report his conversations with appellant, this does not seem to us to constitute an invasion of appellant's rights. Appellant had the responsibility of choosing his own confidants. *See* Hoffa v. United States, 385 U.S. 293, 302, 304–306, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The alleged activity involved the co-defendant talking only with appellant, not with appellant's attorney.

██ The charge of perjury by the co-defendant before the grand jury lay in his alleged testimony that he had not received any promises or threats, appellant's offer of proof being that the co-defendant had had many talks with an F.B.I. agent and had been promised a light sentence, and the dismissal of other prosecutions, with opportunity to continue his education. The co-defendant did not testify at trial, so his credibility was never put to the test. But appellant's reliance on Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956) and Communist Party of the United States v. Subversive Activities Control Board, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956), is misplaced. These cases dealt with perjury at trial.

8. *This accords also with the observation* of the President's Commission on Law Enforcement and Administration of Justice:
 "For cases to move expeditiously through a court with many judges and thousands of cases, it is necessary that all the cases and all the judges be centrally supervised. Central supervision of cases makes it possible to keep track of the status of every case, to shift cases from one judge to another according to their various caseloads, to set up special calendars for cases that inherently demand prompt action or that have fallen behind the normal schedule. * * * " "The Challenge of Crime in a Free Society", p. 156, 1967.

Here we deal with alleged perjury before the grand jury by one witness. Even if the charge were true, the record reveals that other witnesses (e. g., bank tellers present at the robbery) testified. That the indictment of a grand jury is not to be impeached by the tainted testimony of one witness is established by the following authorities. Costello v. United States, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); Laughlin v. United States, 128 U.S.App.D.C. 27, 385 F.2d 287 (1967); Coppedge v. United States, 114 U.S.App.D.C. 79, 311 F.2d 128 (1962), cert. denied, 373 U.S. 946, 83 S.Ct. 1541, 10 L.Ed. 701 (1963).

### V

Appellant challenges the admission of identification testimony of the bank manager (Mr. Daly), two tellers (Mrs. Doherty and Mrs. McCollum), and a policeman (Officer Walsh). The manager and the two tellers had all observed the robbery at close range in the well lighted bank for periods ranging up to five minutes; Officer Walsh had stopped two men in a car shortly after the morning robbery. The robbers wore no masks, although appellant was wearing sunglasses. Each witness separately and without suggestion identified appellant's photograph the day after the robbery. Appellant concedes that this procedure comported with the due process standard expressed in Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

 Subsequent identifications, however, give rise to his objections. The first concerns the showing of photographs to Mrs. McCollum and Officer Walsh. In Mrs. McCollum's case, after identifying two photographs of the appellant, she asked to see others of the same person so that she could be positive. She was then shown another group of nine photographs and again picked appellant. Certainly this subsequent showing of a group of photos at her request which in no way emphasized appellant was as fair as the police could have been in this regard. Secondly, Officer Walsh, after positively identifying appellant in a group of photos, asked to see a different picture of appellant, which was shown him the following day. This single-photo incident presents more difficulty, for it does tend inherently to focus the witness's attention on that individual. However, when such focus is the result of the witness's request, the image may become clearer but the inference of guilt does not arise as it does when the police are the ones who isolate or focus on the particular individual. In light of this and Officer Walsh's initial positive identification, we do not believe that this viewing of the single photo was unnecessarily conducive to irreparable mistaken identification. Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969); Stovall v. Denno, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L. Ed.2d 1199 (1967); see Simmons v. United States, *supra* 390 U.S. at 384, 88 S.Ct. 967, and United States v. McNamara, 422 F.2d 499 (1st Cir. 1970), filed this date.

Appellant's second challenge is to the identification testimony of Mrs. Doherty and Mr. Daly. Five weeks after their identification of appellant's photographs, they were asked by the F.B.I. to visit a courtroom, no statement being made as to what or whom they were to see. Each entered and departed separately. Several people were in the courtroom, including the appellant, who was sitting alone in the front row. Mrs. Doherty almost immediately told the agent that she wanted to leave the room, pointing to appellant as the man who had robbed the bank. Mr. Daly also identified appellant, though less traumatically.

 These pre-trial identifications having occurred before June 12, 1967, they are not to be judged by the right to counsel rule of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), or Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Stovall v. Denno, *supra* 388 U.S. at 296, 87 S.Ct. 1967. Ours then is the due process standard of *Stovall* and *Foster:* whether the

courtroom identifications were "so unnecessarily suggestive and conducive to irreparable mistaken identification". We have no difficulty in concluding—in light of the opportunity of these witnesses to observe appellant at the scene of the robbery and their positive identification of him from fair displays of photographs and in the courtroom—that while the courtroom incident may have been somewhat suggestive, there was no real likelihood of mistaken identification which arose therefrom. *See* Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1246–1250 (1968).

VI

Appellant, by two motions for disclosure of exculpatory evidence,[9] sought any government evidence that prospective witnesses or co-defendants had expressed inability or uncertainty in identifying appellant or his co-defendants; that a co-defendant had been unable to identify the bank or its environs; that the co-defendant's testimony before the grand jury had been perjured;[10] and disclosure of any promises which had been made to informants or witnesses and "any other matters * * * which would be of material assistance to the defendant." The trial court did order the government to furnish the defense with any exculpatory evidence it had, but when the court was assured by government counsel that it had none, the court denied appellant's motions for disclosures.

We read Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Giles v. Maryland, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737

(1967), to require fair use of evidence by the prosecutor, accompanied by a duty to disclose evidence materially favorable to the defendant. Rule 16, F.R.Crim.P., implements this duty. We do not read those cases to authorize extensive pretrial discovery by the defendant. *E. g.,* United States v. Manhattan Brush Co., 38 F.R.D. 4 (S.D.N.Y.1965). Looking back over the trial and the evidence offered by the government, we cannot say that the government knowingly allowed any false evidence to be admitted, Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), or that evidence materially favorable to the defendant was suppressed or withheld. Brady v. Maryland, *supra* 373 U.S. at 87, 83 S.Ct. 1194.

The only specific instances now raised by appellant involve a possible inconsistency in the identification of appellant by Mrs. Doherty, a teller,[11] and an inconsistency in the description of the gun by one of the four bank witnesses. The government denies knowing of any such inconsistencies, to which appellant responds with a plea for a presumption of knowledge, even though the alleged inconsistencies were spoken to local police, not the government's investigators on the scene immediately after the robbery. We are inclined to believe the government in these circumstances. However, even assuming both the alleged inconsistencies and the government's awareness of them, we cannot say that the prosecutor's failure to disclose them amounts to reversible error. Defense counsel learned of the inconsistency concerning the color of the gun prior to trial and introduced testi-

---

9. One was a very general motion, followed some months later by a more specific one. We consider only the second.

10. Appellant sought any government evidence that the co-defendant had perjured himself. He made no request, and no showing of "particularized need", for the grand jury testimony itself. Dennis v. United States, 384 U.S. 855, 868–875, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966).

11. Appellant asserts that after the trial he learned from a Randolph police officer

that Mrs. Doherty had described the robber differently to him than to the F.B.I. However, her description given to the F.B.I. a few minutes after she had allegedly talked to the Randolph officer included height, sex, color, weight, build, age, hair, complexion, and beard —which description substantially withstood vigorous cross-examination. Appellant has alleged only that his investigator reported that Mrs. Doherty's description to the Randolph officer "was materially different". No further detail has been presented to us.

mony at trial concerning the inconsistency. Thus, even assuming it was material—which we doubt—there was no possible prejudice to appellant arising from the nondisclosure. Keeping in mind that the prosecutor's duty of disclosure is imposed to assure fairness to the accused rather than to punish the prosecutor or the public, Brady v. Maryland, *supra* 373 U.S. at 87, 83 S.Ct. 1194, we believe the absence of conceivable prejudice to the accused completely disposes of his objection. The second objection concerning possible initial confusion by Mrs. Doherty presents a closer case, for appellant apparently did not learn of this until after trial. However, we believe that her detailed and substantially accurate description to the F.B.I. immediately after the robbery, *see* n. 11, and her positive identification of appellant as the robber in an uncontested display of photos the day after the robbery completely dispels any concern with her alleged initial confusion. In light of this and the existence of several other eye witnesses who positively identified appellant as the robber—*compare* Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968)—we simply fail to see how appellant's knowledge of this isolated alleged inconsistency could possibly have been material to the resolution of this case. The fact that defense counsel could have learned of this either through normal trial preparation or the Jencks Act serves to strengthen our disposition of this objection.

### VII

The remaining contentions can be summarily disposed of. Concerning the alleged ex parte conversations between government counsel and the trial judge, we are assured by the former that only one such conversation took place. This incident was clearly improper, particularly since it occurred in the judge's chambers behind the bench just before the jury trial was to begin. *See* Haller v. Robbins, 409 F.2d 857 (1st Cir. 1969). Counsel's explanation was that he wished to advise the judge that he had the Hong Kong flu, leaving it to him whether and how to proceed. We feel quite strongly about such private conferences, Haller v. Robbins, *supra;* no matter how well intentioned the motive, it is better to risk infecting counsel than the process of justice. However, prejudice was not alleged and we find no indication that the merits of the case were discussed or were in any way affected here. Displeasure—which we have manifested—is in order but a reversal is not.

We deem appellant's objection concerning allegedly false statements by government counsel about the procedural status of the case to be of insufficient consequence to merit discussion. Appellant's objection to the exclusion of testimony that at least one witness saw a nickel-plated gun rather than a black gun is without merit, because the information had already reached the jury through another's testimony; it was hearsay not offered for a limited purpose; and it was not in any sense reversible error even if such exclusion had been error.

Affirmed.