UNITED STATES of America,
Appellee,

v.

Peter FAY, Defendant-Appellant.

No. 74–1235.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1974.

Decided Nov. 11, 1974.

Thomas Christian DeCourcy, Boston, Mass., for defendant-appellant.

Charles E. Chase, Asst. U. S. Atty., with whom James N. Gabriel, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

This case is the latest in a series where a defendant, convicted in a criminal case, has sought to void his conviction because of an alleged violation to his Sixth Amendment right to a speedy trial.[1] This is the first case in which our view of all the relevant factors requires a reversal.

Appellant was indicted on February 12, 1973 for conspiring to distribute cocaine in violation of 21 U.S.C. § 846. A month later, on March 13, appellant's retained counsel filed a number of motions including a motion for speedy trial. Arraignment was held the following day without action having been taken on the motions. Trial was set for April 25. During April and May co-defendants of appellant filed motions for continuance, for appointment of counsel, for discovery, and for severance. A second trial date, May 23, was passed without trial. On July 24, 1973, the government filed a motion for trial, pointing out that the 180 day period prescribed in the Massachusetts District Court's Plan for Achieving Prompt Disposition of Criminal Cases which was adopted pursuant to rule 50(b) of Fed.R.Crim.Proc., was to expire on August 27. August 21 was then set as the date for trial. When

---

1. *See, e. g.,* Flemming v. United States, 378 F.2d 502 (1st Cir. 1967) ; Carroll v. United States, 392 F.2d 185 (1st Cir. 1968) ; United States v. DeLeo, 422 F.2d 487 (1st Cir. 1970) ; United States v. Butler, 426 F.2d 1275 (1st Cir. 1970) ; United States v. Daley, 454 F.2d 505 (1st Cir. 1972) ; United States v. Cabral, 475 F.2d 715 (1st Cir. 1973) ; United States v. Churchill, 483 F.2d 268 (1st Cir. 1973).

that date came, the court disposed of severance and discovery motions, including a motion by appellant for severance, but the case was passed, the appellant being put on a 24 hour notice for trial.

On October 17, 1973, appellant filed a motion for judgment of acquittal and for oral argument. Subsequent to this activity, the case lay quiescent for some six months until the parties received notice that the case had been transferred to a visiting judge and was assigned for trial on June 3, 1974. On May 21, 1974 appellant filed a motion to dismiss based on denial of his right to a speedy trial. Hearing was held; the motion was denied; and the trial, which took place on June 4, resulted in a guilty verdict. Appellant was sentenced to a one year term, the sentence being suspended and appellant being put on probation for three years with the special parole term provided by law. 21 U.S.C. § 841(b).

On June 3, 1974, immediately before trial, a hearing was held on appellant's speedy trial claim at which the court thoroughly explored both the reasons for delay and the possibility of prejudice. The court identified the appropriate period for explanation as the nine month period beginning on August 21, 1973, the third date set for trial, and June 4, 1974, the date of trial. It recognized that the defendant was under no obligation to take affirmative action. It inquired as to the source of responsibility. The Assistant United States Attorney had asked for trial shortly before the 180 day period had elapsed. He had talked to the clerk of the judge to whom the case had been assigned. The fact remained that nothing happened from August 21, 1973 until April, 1974, when the parties were notified that the case had been assigned for trial before a visiting judge on June 3, 1974. At one point the court exhibited its frustration by saying that there seemed to be a lack of system for coordination among the

offices of the United States Attorney, the clerk, and the judge—a "Tinker to Evers to Chance" situation—without, we add, the effectiveness characterizing that three-some or the appellant having an opportunity to hit a pitched ball.

The alleged specific prejudice lay in the fact that in May, 1973, one Isherwood, who had been with appellant in his apartment at the time of arrest, visited appellant's counsel and related to him a version of events leading up to the arrest to which he was willing to testify. The putative testimony conflicted with that of the prosecution concerning events shortly before and at the time of appellant's arrest on January 19, 1973. The government agents' version was that appellant was seen entering his apartment building, carrying a white paper bag; that subsequently one Owens, who had gone in the building shortly before appellant, was seen leaving the building carrying a white paper bag. Owens placed the bag in the trunk of appellant's automobile, drove off, and was later arrested as he tried to sell a pound of cocaine to a government agent. The agents then entered appellant's apartment, and arrested both appellant and Isherwood. On appellant's person the agents found $1500 of identifiable money. Appellant said that the money had been given him by his grandmother for college tuition. It is alleged that Isherwood's testimony would have differed from this in two respects. According to appellant's counsel's notes, he would have testified that he was in the apartment both when Owens and appellant entered,[2] appellant at no time gave anything to Owens, and Owens was not carrying anything when he left appellant's apartment. He would also have said that appellant explained that he possessed the money because Owens, fearful of being robbed, had asked him to hold it while he did an errand.

Counsel for appellant had apparently not made any effort to keep in touch

2. Before the court, counsel, apparently referring to his notes, said that when Isherwood entered the apartment, Owens was already there. We do not understand the discrepan-

cy but it seems not to be material. We take the version in the text from the stipulation submitted by counsel for purposes of this appeal.

with Isherwood until shortly before the June 3 trial date. At that time, he unsuccessfully tried to contact Isherwood. His efforts included contacting Isherwood's mother and visiting places Isherwood was known to have frequented. No reference was made to any prior efforts to locate Isherwood. The court, while stating at one point that it agreed with counsel that appellant had been prejudiced, apparently felt that any "substantial prejudice" would be eliminated by allowing appellant to introduce a statement as to what Isherwood would have testified—"in explanation of the fact that he is unavailable". It also barred the prosecution from introducing any evidence of "overt act 9", which alleged that Owens and appellant, on January 19, 1973, packaged a pound of cocaine at appellant's apartment.

The district court applied, as do we, the "difficult and sensitive balancing process" required by Barker v. Wingo, 407 U.S. 514, 533, 92 S.Ct. 2182, 33 L. Ed.2d 101 (1972). It found no difficulty in applying three of the four factors identified in *Barker*. It obviously felt that a delay of nine months following the third trial date, August 21, 1973, was enough to trigger inquiry into the reasons for delay. While it did not deem a very early request for speedy trial helpful to appellant, the court recognized that appellant had no affirmative duty to bring his case on for trial and, by implication, that appellant could not be said to have waived his right to speedy trial. And the court was quite articulate in its conclusion that no satisfactory explanation for the delay on the part of the government had been forthcoming.

With the scales tipping in favor of appellant, the court then faced a specific claim of prejudice. Counsel presented his notes of an early interview with a potential witness who had disappeared from sight—a witness whose presence at a critical time was corroborated by prosecution witnesses. The court's concern

about the relevance of the missing witness' testimony is shown by its joint requirement that the prosecution not introduce any evidence of the alleged ninth overt act and that appellant's counsel be allowed to read Isherwood's statement into evidence.[3] The court was apparently influenced by the fact that there had been no showing that either appellant or his counsel had, from May of 1973 until May of 1974, made any effort to keep in touch with what they lately claimed to be a critical defense witness.

We can understand the skepticism of the court. It is all too easy, through wishful thinking or post hoc reconstruction, to conjure up what someone long since vanished from the scene might have said. Were the scales as to the other factors more in balance (particularly, were a defendant to have participated in the delay), or were there less corroboration of the criticality and existence of the witness, or were the missing testimony a matter only of speculation, we would be able to reach a different conclusion. But on this record, where the appellant did not contribute to the nine month delay, where the delay apparently stemmed from the inability of the judge having charge of the case to hear it, and where counsel, an officer of the court, revealed the contents of his notes of an interview with a witness who, as the government agents acknowledge, was present with appellant at the time of arrest and was also arrested, we cannot impose on appellant the additional burden of an adverse inference from non-availability of a witness. The effective result of such a burden would be to allow the apparent lack of vigilance of defendant and his counsel in checking on their witness to overbalance the three factors clearly favoring defendant and a fourth which at least facially—with some indicia of substantiality—indicates that defendant was prejudiced. This seems to us a balancing process with weighted scales.

3. Counsel did not accept the court's invitation.

The government's approach would turn upside down the responsibility for seeing that cases are promptly brought to trial. As the Court in *Barker* said, its rule—and the Constitution—place "the primary burden on the courts and the prosecutors." 407 U.S. at 529, 92 S.Ct. at 2191. This burden and the right it serves are not prudential or derived by implication from considerations of judicial administration. To quote *Barker* again, ". . . [B]ecause we are dealing with a fundamental right of the accused, this [balancing] process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." 407 U.S. at 533, 92 S.Ct. at 2193. If, after an overlong and unjustified passage of time, a known witness, as to whom there exists substantial reason to believe that he would have given specific and relevant testimony, is not available, through no connivance of the defendant, it seems to us that the disadvantage must fall to the government, which has the primary burden of expedition.

We therefore reverse and invoke the "unsatisfactorily severe . . . but . . . the only possible remedy" of dismissal of the indictment. 407 U.S. at 522, 92 S.Ct. at 2188.

We are impelled to say more, since the colloquy in the district court reveals an institutional weakness. As the court observed, "[T]here's no system that exists . . . as between the judges, the United States Attorney's Office, and the Clerk's Office. . . ." The system adopted for normal allocation of judicial work is an excellent one: the individual calendar. Judges take cases by random assignment and they have full responsibility for their own docket, from beginning to end. We do not quarrel at all with that principle of judicial administration. But there remains a need for some central monitoring, coordination, and reallocation. The district court's "Plan for Achieving Prompt Disposition of Criminal Cases" now provides, in paragraph 8(c), that "At not more than 6 month intervals the judges of the court shall meet to review the status of all persons in custody and all cases in which the maximum time limits set forth in section 2 have been exceeded. Cases shall be reassigned as appropriate in order to carry out the purpose of this Plan." If this is the sole mechanism for intra-court cooperation, it clearly is not enough.

As we said nearly five years ago, in United States v. DeLeo, 422 F.2d 487, 496 (1st Cir. 1970), quoting then Circuit Judge Blackmun in Hodges v. United States, 408 F.2d 543, 551–552 (8th Cir. 1969):[4]

"Where a multiple-judge court uses the individual calendar system, all judges must share responsibility for the prompt disposition of criminal cases, must employ a team approach to those cases, and, when necessary, must reassign them in order that they may be tried according to the commands of the Sixth Amendment and Criminal Rules 48(b) and 50. If a judge is otherwise long committed in another case or is delayed in getting to the criminal cases on his calendar by reason of illness, personal misfortune or press of other business, this obviously does not serve to toll the enforcement of the right of a defendant awaiting trial on that judge's criminal calendar."

There was some suggestion by the judge presiding at the speedy trial hearing below that prosecutors have a responsibility on occasions to exert every effort to force judges to act. To this the Assistant United States Attorney replied with a reference to our statement in United States v. DeLeo, *supra*, 422 F.2d at 499, where we indicated our disapproval of ex parte conferences with a judge, even if the conference dealt only with schedule problems. We are of the same view today. The problem of keep-

---

**4.** More recent indications of our uneasiness on this issue may be found in United States v. Cabra, 475 F.2d 715 (1st Cir. 1973), and United States v. Churchill, 483 F.2d 268 (1st Cir. 1973) (concurring opinion, Coffin, Chief Judge).

ing track of aging criminal cases and seeing that, absent special and justifying circumstances, they are brought to issue within prescribed time limits ought not to be left to prosecutorial pleas, ex parte or not. It ought to be resolved by devices and procedures built into the system. What we said in *De-Leo* takes on even more cogency today:

"We refrain from saying that 'a team approach' is the only mechanism possible; it may well be that one judge could be assigned the responsibility of surveying the calendar. The important point is that there must be some central supervision over crowded dockets in multi-judge courts utilizing the individual calendar system, or that, at a minimum, there be a recognized collective obligation to respond to the self-generated action of the judge whose docket, particularly whose criminal docket, is in arrears. The advantages of the individual calendar cannot justify rigid adherence to that system at the expense of the rights of individual litigants." [Footnote omitted.] *Id.* at 496.

Reversed; remanded to the district court for a judgment dismissing the indictment against appellant.