UNITED STATES of America

v.

Kevin WOODWARD and Gregory
Jackson, Defendants

No. CRIM. 00–86–P–C.

United States District Court,
D. Maine.

Jan. 29, 2001.

Donald E. Clark, Office of the U.S. At-
torney, Portland, ME, for U.S. Attorneys.

Leonard I. Sharon, Sharon, Leary &
Detroy, Auburn, ME, for Kevin E. Wood-
ward.

E. James Burke, Lewiston, ME, for Gregory L Jackson.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS AND FOR ADDITIONAL DISCOVERY

GENE CARTER, District Judge.

The Court now has before it Defendants' Motion to Suppress, in which they seek suppression of all evidence seized from their residence and any evidence derived from the search of their residence. Docket No. 12. Specifically, Defendants argue that the use of a thermal imaging device without a warrant to do so violates each Defendant's right to be free from unreasonable searches and that the warrant ultimately issued was itself based on an illegal search. *Id.* Defendants also contend that the search warrant was based on a false statement and that without that statement there was insufficient evidence to issue a search warrant. The Government opposes the motion, arguing that the use of a thermal imaging device is not a search within the meaning of the Fourth Amendment and that even though the warrant application contained a false statement, there was otherwise sufficient evidence to establish probable cause. Docket No. 19. Defendants have also filed a Motion for Discovery requesting additional discovery. Docket No. 13.

## I. FACTS

In April 2000, Maine Drug Enforcement Agency ("MDEA") Special Agent Eric Audette received information from a Confidential Informant ("CI") that a marijuana growing operation was being conducted at a residence located on the North Turner Road at Box 884 in Turner, Maine, by Roger Mercier and others. Government Ex. 9D. CI has known Mercier for several years and believed it was his/her responsibility to come forward and inform law enforcement about Mercier's drug trafficking.[1] *Id.* The North Turner Road residence was rented by Jennifer Carlin. *Id.* On separate occasions in April 2000, CI had personally observed Mercier in possession of over fifty pounds of processed marijuana and a few marijuana plants, two to three feet in height, at the residence of Jennifer Carlin. *Id.* CI informed Agent Audette that Mercier had several people working for him and that Mercier did not live at the North Turner Road address but used it only to grow and distribute marijuana. MDEA knew Mercier to have been convicted twice for marijuana possession and trafficking. Government Ex. 9E. Once the marijuana was processed, Mercier, Carlin, and Kevin (last name unknown) were in charge of distribution. *Id.* The Turner Road house, CI told Agent Audette, was just one of Mercier's six indoor marijuana cultivation facilities. *Id.*

For the next six weeks, Special Agent Audette episodically observed the Turner Road residence, noting that the entire second floor of the residence appeared uninhabited and that dormer windows on that floor were completely covered up, preventing light from entering or exiting. *Id.* During that period of time, an officer with the National Guard Counter Drug Program, familiar with the use of carbon dioxide in indoor marijuana growing operations, also observed a carbon dioxide canister just outside the residence. *Id.* Based on this information, MDEA Special Agent Tony Milligan obtained Central Maine Power ("CMP") electric power consumption records for the residence. Government. Ex. 9E. Analysis of these CMP records re-

---

**1.** CI is not currently charged with any criminal offenses.

flected two distinct cycles, approximately three months in length—October through December 1998 and April through July 1999—where consumption was significantly higher than at other times during the period from June 1998 through May 2000.[2] *Id.* These cycles were consistent with the three-month growing cycles typical of an indoor marijuana growing operation. *Id.*

On May 13, 2000, Special Agents Audette and Milligan went to the public street in front of the residence. *Id.* In an effort to determine whether there was an abnormally high amount of heat being emitted from the second floor of the Turner Road residence, Agent Milligan stood on the public road, and later in an adjacent driveway, not part of the Carlin premises, aiming the Raytheon Palm 250 thermal imaging camera at the residence and recording the images which it generated.[3] Government Ex. 10. Agent Milligan detected an unusually high amount of heat emanating from the second floor dormers of the residence, where the windows had previously been observed to be covered. *Id.* In

Milligan's opinion, the heat emissions were consistent with the use of heat-generating lights for an indoor marijuana growing operation on the second floor. Government Ex. 9E. Other residences in the neighborhood with clapboard construction comparable to the Carlin home did not have similar heat loss from second floor dormers. *Id.*

Special Agents Audette and Milligan thereafter prepared affidavits as part of an application to obtain a search warrant of Defendants' residence. Government Exs. 9D and 9E. On May 15, 2000, a search warrant was issued by Maine District Court Judge Paul Cote, Jr. Government Ex. 9F. On May 16, 2000, during the search of the residence pursuant to the warrant, the officers found, among other things, a marijuana growing operation.

## II. DISCUSSION

### A. Use of the Thermal Imaging Device

 The Fourth Amendment protects an individual's reasonable expectation of

---

2. The records revealed that during the months of June to September of 1998, power consumption ran between 22 and 35 kilowatt-hours ("kWh") per day, which testimony revealed was considered to be normal power consumption of a residence of that type. Government Ex. 9E. In October 1998, however, power consumption jumped from 33 kWh per day to 46 kWh per day. *Id.* In November and December 1998, it again climbed to 50 kWh per day and then to 54 kWh per day. *Id.* In January 1999, power consumption dropped to 30 kWh per day and stayed within the normal range during February and March 1999. *Id.* Power consumption climbed from 33 kWh per day in March 1999 to 48 kWh per day in April 1999. *Id.* Power consumption increased to 50 kWh per day in May and to 59 kWh per day in June and July 1999. *Id.* In August 1999, it dropped to 44 kWh per day. In September, it dropped to 33 kWh per day. In October 1999, it dropped to 31 kWh per day. In the winter months of 1999 into 2000, the highest consumption was recorded in January 2000 at 40 kWh per day. *Id.*

Defendants questioned the Government's thermal imaging expert's opinion that 30 kWh per day is the average power consumption for a single-family dwelling in the United States. On cross-examination, the expert testified that he used Pacific Gas and Electric of California's determination of the average power usage for a single-family dwelling. It is not clear whether PGE had calculated the electric usage based on usage at single-family dwellings in California or whether it had based it average on power usage across the United States. Defendants raised the issue but never offered evidence that the daily electric usage for a single family dwelling in Maine was different from that of a similar dwelling in California. Thus, for the purposes of this motion, the Court accepts 30 kWh per day as an average power usage for a single-family dwelling in Maine.

3. Agent Milligan is trained in the use of the thermal imaging device. *See* Government Exs. 9A and 9B.

privacy against intrusion by the government. The test for determination of a reasonable expectation of privacy is twofold: (1) the defendant manifests an actual, subjective expectation of privacy; and (2) the expectation is one that society is prepared to recognize as legitimate. *California v. Ciraolo,* 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Defendants argue that the use of a thermal imaging device without a warrant violates their right to be free from unreasonable search. The Government responds that the use of a thermal imaging device is not a search within the meaning of the Fourth Amendment.

The issue of whether use of a thermal imaging device constitutes a search within the meaning of the Fourth Amendment is one of first impression in the First Circuit. All of the circuit courts that have considered the issue have concluded that the use of a thermal imaging device is not a search within the meaning of the Fourth Amendment. *See United States v. Kyllo,* 190 F.3d 1041 (9th Cir.1999), *cert. granted,* 530 U.S. 1305, 121 S.Ct. 29, 147 L.Ed.2d 1052 (2000); *United States v. Depew,* 210 F.3d 1061, 1066 (9th Cir.2000); *United States v. Myers,* 46 F.3d 668, 669–70 (7th Cir.), *cert. denied,* 516 U.S. 879, 116 S.Ct. 213, 133 L.Ed.2d 144 (1995); *United States v. 15324 County Highway E.,* 219 F.3d 602, 604–05 (7th Cir.2000); *United States v. Ishmael,* 48 F.3d 850, 853 (5th Cir.), *cert. denied,* 516 U.S. 818, 116 S.Ct. 74, 75, 133 L.Ed.2d 34 (1995); *United States v. Robinson,* 62 F.3d 1325, 1328–30 (11th Cir.1995), *cert denied,* 517 U.S. 1220, 116 S.Ct. 1848, 134 L.Ed.2d 949 (1996); *United States v. Ford,* 34 F.3d 992, 995–97 (11th Cir.1994); *United States v. Pinson,* 24 F.3d 1056, 1058–59 (8th Cir.), *cert. denied,* 513 U.S. 1057, 115 S.Ct. 664, 130 L.Ed.2d 598 (1994). In identifying the privacy interest at stake, several courts have focused on the thing actually searched—here, the heat emanating from the residence—rather than on the privacy interest in the activities inside the residence. Those courts have held that the thermal imager simply measures surface heat, in which there is no reasonable expectation of privacy, and that the information gathered " 'is neither sensitive or personal, nor [revealing of] the specific activities within the ... home.' " *Kyllo,* 190 F.3d at 1046–47 (quoting *Ford,* 34 F.3d at 997); *see also Myers,* 46 F.3d at 669–70; *Robinson,* 62 F.3d at 1328–30. Other courts, while finding that the defendant may have a subjective privacy expectation in the site of the illicit activity, have held that the privacy interest identified is not one that society is prepared to accept as reasonable. *See Ishmael,* 48 F.3d at 855; *Myers,* 46 F.3d at 669–70; *Pinson,* 24 F.3d at 1058–59.

Defendants rely on the analysis in *United States v. Cusumano,* 67 F.3d 1497 (10th Cir.1995) and *United States v. Elkins,* 95 F.Supp.2d 796 (W.D.Tenn.2000). When faced with the issue, both courts concluded that the use of a thermal imaging device was an unconstitutional search reasoning that the pertinent inquiry is not whether the defendant retains an expectation of privacy in the heat waste generated from the home but, rather, whether there is an expectation of privacy in the heat signatures of the activities inside the home. Defendants concede, however, that the *Cusumano* decision was vacated when the Tenth Circuit issued its *en banc* decision holding that the subject warrant was supported by probable cause without considering the results of the thermal image camera and that it was, therefore, unnecessary to decide the constitutionality of the thermal imager's use. *United States v. Cusumano,* 83 F.3d 1247, 1250 (10th Cir. 1996)(*en banc* ). This Court is not persuaded by the analysis in the first, later vacat-

ed, *Cusumano* opinion or the *Elkins* opinion.

■ The Raytheon Palm 250 thermal imager detects and illustrates temperature differences on the surface of the residence without revealing activities inside the home.[4] The interior activities were not visible because the thermal imager used by Agent Milligan does not enable him to see through windows or walls. Government Ex. 9I. The Court holds that Defendants have no reasonable expectation of privacy in the heat emanating from their residence and, thus, the agent's use of the Raytheon Palm 250 thermal imaging device was not a search within the meaning of the Fourth Amendment.

## B. False Statement in Agent Milligan's Affidavit

Defendants also assert that Agent Milligan's affidavit contains a false statement without which there was insufficient information upon which to conclude that there was probable cause to support the issuance of a warrant to search the residence. The part of Agent Milligan's affidavit that Defendants assert to be false states "the residence in question is a small two-story home with no swimming pool or other obvious high-power consumption product." Government Ex. 9E, ¶ 5. The residence does have an in-ground pool in the back yard. *See* Government Ex. 1. The presence of this in-ground pool, Defendants contend, would offer one possible explanation of the high electric power consumption that lead the district judge to issue the search warrant. The Government concedes that the

statement was false but asserts that it was not made intentionally and that the false statement was not necessary for the finding of probable cause.

In *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court held that to challenge an affidavit that is valid on its face, a defendant bears the burden of demonstrating, by a preponderance of the evidence: (1) that the affidavit contains intentionally or recklessly false statements, and (2) that the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause. *See also United States v. Owens*, 167 F.3d 739, 747 (1st Cir.1999); *United States v. Spinosa*, 982 F.2d 620, 625 (1st Cir.1992); *United States v. Melvin*, 596 F.2d 492, 498 (1st Cir.), *cert denied*, 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979).

■ The Court does not find that the statement regarding the absence of a swimming pool at the subject residence was a deliberate falsehood or that it was made with reckless disregard to the truth. Agent Milligan testified that when he went to the residence to use the thermal imaging camera, he did not notice the in-ground pool behind the house. In addition, the Court notes that the mere presence of a pool would be insufficient to explain high power consumption; the pool would need to be operational. Assuming, however, that Defendants have shown that it was reckless for Agent Milligan to assert that the high power consumption was not the result of an operational in-ground pool, the Court

---

**4.** Defendants offered the expert testimony of John Smedley, Ph.D., a physics professor from Bates College. Dr. Smedley testified that a sufficiently sensitive thermal imaging device could detect movement of persons inside a home. The Court agrees with Defendants assertion that a device of such power would present important questions under the Fourth

Amendment. Dr. Smedley was not, however, familiar with the Raytheon Palm 250 imaging device used in this case and, thus, could not opine regarding its capabilities. The Court is satisfied that the thermal imaging device used here—the Raytheon Palm 250—is not sufficiently sensitive to detect movement or reveal details from inside a structure.

concludes that, even cleansed of this false statement, the information presented to the judge provided a substantial basis to conclude that probable cause existed.[5]

Here, the search warrant application incorporated the affidavits of Agents Audette and Milligan which provided current, first-hand information from a concerned citizen that a marijuana growing operation was being conducted in the North Turner Road residence. A carbon dioxide canister, known to be used in indoor marijuana growing operations, had been observed at the residence. The second floor windows were covered. A thermal imaging camera showed excessive heat emanating from the second floor dormers, but not from the peak of the roof—again, consistent with an indoor marijuana growing operation. Analysis of electric bills reflected two three-month cycles of unusually high electric power usage in the last year. The timing of the first power usage spike is inconsistent with the operation of an outdoor, uncovered, in-ground pool in Maine. Although, it is possible that the second power spike could have resulted from an operational pool, the Court concludes that, even without Agent Milligan's statement regarding the absence of a pool, the singular, unexplained power spike, coupled with the other evidence supporting an indoor marijuana growing operation detailed in the agents affidavits, was sufficient for the issuing judge to conclude that probable cause existed.

### C. Request for Additional Discovery

By separate motion, Defendants have requested a wide variety of additional discovery under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Federal Rule of Criminal Procedure 16(c), (d), and (e). The Government responds that it has provided Defendants with all materials it is required to produce under Rule 16 and is not now aware of any *Brady* material in its possession. In addition, the Government asserts that, if and when it becomes aware of any *Brady* material, it will turn it over to Defendants as required.

▮ The Court concludes that Defendants have failed to demonstrate that there is any material in the Government's possession that has not been previously disclosed and which is implicated by the provisions of Rule 16(c), (d), or (e). With respect to the requirements of *Brady*, the exculpatory nature of such material may not be evident until trial; thus, *Brady* establishes no general right of discovery and creates no pretrial remedies. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. DeLeo*, 422 F.2d 487, 498 (1st Cir.1970). The Court is satisfied that the Government understands its duty to disclose any exculpatory evidence in its possession in a manner useful to Defendants and timed to avoid any delay at trial. The Court will, therefore, deny Defendants' request for additional discovery.

### III. CONCLUSION

Accordingly, the Court **ORDERS** that Defendants' Motion to Suppress be, and it is hereby, **DENIED.** The Court further **ORDERS** that Defendants' Motion for Discovery be, and it is hereby, **DENIED.**

---

5. Because the Defendants asserted the unlawful use of the thermal imaging device in conjunction with the *Franks* challenge, it was not necessary for the Court to decide whether Defendants were entitled to a hearing specifically on the issue of whether the statement was the result of a reckless falsehood.