# EPPS *v.* STATE OF MARYLAND

[No. 236, September Term, 1974.]

*Decided October 6, 1975.*

The cause was argued before Murphy, C. J., and Singley, Smith, Digges, Levine, Eldridge and O'Donnell, JJ.

*Alfred L. Scanlan,* with whom were *Shea & Gardner* and *Gerald N. Klauber* on the brief, for appellant.

*James G. Klair, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court.

The sole question here presented upon our grant of a writ of certiorari to the Court of Special Appeals is the frequently argued question whether a defendant in a criminal case was denied his constitutional right to a speedy trial.

The appellant, Larry Epps — together with two co-defendants, Morris Bea and Erskin Evans, was convicted by a jury in the Criminal Court of Baltimore on August 23, 1973 — one year and 15 days after his arrest, of having robbed, with a dangerous or deadly weapon (a knife), one Wilbert McNeil and taking from him a radio-tape recorder valued at $59.95 plus $3.00 in cash. *See* Maryland Code (1957, 1971 Repl. Vol.) Art. 27, § 488. Epps, who did not testify at his trial, was sentenced on September 14, 1973 by the presiding judge (Watts, J.) to a term of 15 years.[1]

McNeil was robbed at about 2 a.m., August 9, 1972 by three men, one of whom carried a knife and another a stick. Immediately following the incident, McNeil ran down the street where he encountered a policeman, to whom he reported the robbery. Cruising with the officer in a police car, McNeil, within a brief interval, observed the bandit trio; one was carrying a radio, the other was still armed with a stick. When the police officer ordered them to "halt," one of the group took flight. A witness identified Epps as the fugitive.

Later the same day, Officer William Surratt was informed by a restaurant owner that Epps was a suspect in the robbery of McNeil. Officer Surratt investigated and after discerning that Epps was carrying a radio bearing the

---

1. On the same date, pursuant to Maryland Code (1957, 1971 Repl. Vol.) Article 31B, § 6, an order was signed referring Epps to Patuxent Institution for an examination as to possible "defective delinquency" as defined in Article 31B, § 5.

initials "W.M." arrested him. Epps at that time was in possession of a knife.

Following that arrest, Epps remained confined in the Baltimore City Jail, unable to arrange bail, up to the date of his trial — August 22, 1973.

It appears that at a pre-trial conference on December 4, 1972, between an assistant state's attorney and counsel who represented each of the defendants, there was no suggestion that any of them wished to elect a jury trial; the cases were thus scheduled, as to each, on the non-jury trial assignment.

When the cases first came on for trial, on December 28, 1972 in the Criminal Court of Baltimore (before Prendergast, J.), Bea and Evans, upon arraignment, each elected trial by jury; the appellant requested that he be tried non-jury. *See* Maryland Rule 741. Through counsel Epps asked "to be tried today and separately," moving as well for a severance, and asserted prejudice from a joint trial. *See* Rule 735. In a dialogue with the court in those proceedings, counsel explained that Bea and Evans had "just made up their minds this past week or so" to elect a jury trial. Judge Prendergast was of the view that such request should have been made before the day of the trial and was satisfied that no such election had theretofore been indicated.

Although it appeared that both Bea and Evans — as well as Epps — were then prepared to go to trial, no jury panel was in attendance during that post-Christmas week.[2]

The prosecutor advised the court that it was his preference "to keep all the three defendants together and present all the evidence at one time against [them];" that the cases should be tried together, that separate trials "would certainly be duplicitous" and that he was "in favor of postponing the case in its entirety and having it reset as quickly as possible." In granting the postponement, Judge Prendergast stated "There may be [a] delay in granting a

---

**2.** The records of the office of the Jury Commissioner of the Supreme Bench of Baltimore City disclose that the petit jury panels which reported for service on December 4 were discharged on December 22, 1972; that the next regular panel of jurors reported on January 2, 1973 for a period of four weeks' service and that subsequently panels reported every four weeks for service.

trial, because of this last-minute change of heart, but I don't think your *clients* have any cause to complain that they have been denied a speedy trial since *they* are the cause of this." (Emphasis added)

Epps' motion for severance, predicated as it was solely upon the fact that he did not wish to be tried with his co-defendants with a resultant "unfair light upon his case," was denied. The trials of each of the defendants were rescheduled for April 13, 1973 — apparently as the first "open" jury trial calendar date, but those proceedings were also postponed by the Administrative Judge, *see* Rule 1211, when at 4 p.m. on that date the cases had not been "reached" and there was "no jury court available." They were rescheduled for June 12, 1973. On that assigned date they were again postponed by the trial judge, concurred in by the Administrative Judge, because Officer Surratt, the arresting officer, had collapsed on June 8, 1973 while on duty, due to "extreme high blood pressure" and had been ordered confined to bed for at least a month. Those aborted trials were then rescheduled for August 22, 1973.

On June 13, 1973, Epps filed a written motion to dismiss the indictment for lack of a "speedy trial," alleging that one of his witnesses, David Epps, who would have established an alibi for him, had the case been tried December 28, 1972, was no longer available since he was then serving with the U. S. Armed Forces in Korea.[3]

Upon a hearing on the motion just before the appellant's trial on August 22, 1973, Judge Watts requested a proffer and Epps' attorney stated:

> "As to Larry Epps there was a witness by the name of David Epps who was an alibi witness who knew at the time of the alleged crime Larry Epps, the Defendant, was in his company elsewhere in another place from that described in the indictment from that presented by the Prosecution."

---

**3.** The record discloses that the sheriff had undertaken to attempt to summons David Epps on February 23, April 4, June 7 and August 14, 1973 but in each instance the summons was returned "non-est — in Army."

Apparently assuming that the alibi witness, David Epps, was a member of the appellant's immediate family, Judge Watts, in denying the motion, commented:

"The Court is mindful of the fact that brothers and sisters and mothers appear and give certain kind of testimony, which I don't accept. In other words, it gets down to that issue of what he heard the brother say, he was with him, which would be a form of *prejudice sufficiently to deny the State the right to try its case* fairly on a serious charge of robbery without [sic] a deadly weapon." (Emphasis added)

When counsel informed the court that David Epps was the appellant's cousin, Judge Watts expressed the view that counsel could ask the court "again to consider it," at the close of the State's case.[4]

Upon being re-arraigned on August 22, 1973 Epps through counsel then — apparently for the first time — elected a jury trial.

Following his conviction, the appellant, pursuant to Rule 759 a and b filed motions for a "new trial and an arrest of judgment," urging error in the denial of his motion for dismissal of the indictment for failure to have granted him a speedy trial. In those post-trial proceedings on September 14, 1973 Epps testified that his cousin, David Epps, was in attendance in the court on December 28, 1972 and would have then testified that the appellant was with him at the cousin's home, at 1711 West Baltimore Street, at the time when the crime was "supposed to have happened."

In an unreported per curiam opinion, the Court of Special Appeals affirmed the appellant's conviction in *Epps and Bea v. State* [No. 59, September Term, 1974, filed September 24, 1974.] That Court, in rejecting Epps' claim that he had been denied a speedy trial, held that the four-month delay from

---

4. Although no such additional motion was made during the trial, counsel renewed that motion after the verdict had been returned. Testimony in connection therewith was presented in post-trial proceedings on September 14, 1973.

August 9, 1972 to December 28, 1972 (almost a period of five months) was "chargeable to the State"; that the three and one-half-month delay from December 28, 1972 until April 13, 1973 was "chargeable to the appellant"; and that the two-month delay from April 13 to June 12, 1973 and the two-month, nine-day delay from June 12 to August 22, 1973 was attributable to "neutral" causes. The Court concluded that the delay, solely attributable to the State, was not of "constitutional dimensions" and that Epps was not prejudiced by the unavailability of his alibi witness, for he "could, through appropriate military channels, have taken the deposition of his witness and could have read the same to the jury."

We disagree with both this reasoning and the result reached and conclude that the appellant was denied his right to a speedy trial within the guarantee of the Sixth Amendment to the U. S. Constitution and Article 21 of the Maryland Declaration of Rights.

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. . . ." U. S. Const. Amendment VI. Article 21, Maryland Declaration of Rights, provides "That in all criminal prosecutions every man hath a right . . . to a speedy trial by an impartial jury. . . ."

The Supreme Court in discussing this Sixth Amendment right in *United States v. Ewell*, 383 U. S. 116 (1966), in an opinion written by Mr. Justice White, stated:

> "This guarantee is an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself. However, in large measure because of the many procedural safeguards provided an accused, the ordinary procedures for criminal prosecution are designed to move at a deliberate pace. A requirement of unreasonable speed would have a deleterious effect both upon the rights of the accused and upon the

ability of society to protect itself. Therefore, this Court has consistently been of the view that 'The right of a speedy trial *is necessarily relative*. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice.' *Beavers v. Haubert,* 198 U. S. 77, 87. 'Whether delay in completing a prosecution . . . amounts to an unconstitutional deprivation of rights *depends upon the circumstances.* . . . The delay must not be purposeful or oppressive,' *Pollard v. United States,* 352 U. S. 354, 361. '[T]he essential ingredient is orderly expedition and not mere speed.' *Smith v. United States,* 360 U. S. 1, 10." 383 U. S. at 120. (emphasis added)

The history of the application of the guarantee of the right to a speedy trial has been characterized by few criteria enunciated by the Supreme Court which have definitively and concisely articulated when the right has been violated. *See Dickey v. Florida,* 398 U. S. 30, 40-41 (1970). That Court in *Klopfer v. North Carolina,* 386 U. S. 213, 223 (1967) made clear however that the right is "as fundamental as any of the rights secured by the Sixth Amendment" and is imposed by the Due Process Clause of the Fourteenth Amendment on the States. *See Smith v. Hooey,* 393 U. S. 374 (1969). Antecedent to 1972, on those few occasions when the question of the application of the right visited the Supreme Court, that Court acted on a case-by-case basis. *See Beavers v. Haubert,* 198 U. S. 77 (1905); *Pollard v. United States,* 352 U. S. 354 (1957); *United States v. Ewell, supra; Klopfer v. North Carolina, supra; Smith v. Hooey, supra; Dickey v. Florida, supra; United States v. Marion,* 404 U. S. 307 (1971).

This Court in *Jones v. State,* 241 Md. 599, 217 A. 2d 367 (1966) in an opinion by Chief Judge Prescott, stated:

"There is little difficulty in stating the law relating to the alleged denial of a speedy trial; however, there is considerable difficulty, at times, in applying that law to the circumstances of a

particular case. This right to a 'speedy trial' is guaranteed to all who are accused of crime by Article 21 of the Maryland Declaration of Rights and by the Sixth Amendment to the Federal Constitution, both of which are self executing. *Harris v. State, supra,* [194 Md. 288, 71 A. 2d 36 1950)]. Since there is no definition of the term in the Constitutions, and the varied circumstances surrounding particular cases are innumerable, and, for the main part, unforeseeable, the term has properly been held to be a relative one, with the determination of the question as to whether or not an accused has been denied a speedy trial depending upon the facts of each particular case. *State v. Murdock,* 235 Md. 116 [200 A. 2d 666 (1964)]." 241 Md. at 608, 217 A. 2d at 372-73.

In 1972, the Supreme Court, in *Barker v. Wingo,* 407 U. S. 514 (1972), pointed out that "[t]he right to a speedy trial is generically different from any of the other rights enshrined in the Constitution for the protection of the accused" and that "[i]n addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to the interest of the accused." It then postulated that "the right to [a] speedy trial is a more vague concept than any other procedural rights," that it is "impossible to determine with precision when the right has been denied" 407 U. S. at 519, 521, and concluded that although a defendant's constitutional rights to a speedy trial cannot be established by any inflexible rule, the denial of the right must be determined on an *ad hoc* basis balancing both the conduct of the prosecution and that of the defendant. In enunciating such a "balancing test" the Court identified four factors as criteria in determining through a "functional analysis" whether or not a particular defendant has been denied this Sixth Amendment right.

The Supreme Court rejected "two rigid approaches" which had been urged upon it as "ways of eliminating some of the

uncertainty" in the application of the right. Finding "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months" the Court rejected the criterion that a criminal defendant must "be offered a trial within a specified time period," although recognizing that the states were "free to prescribe a reasonable period consistent with constitutional standards." 407 U. S. at 523. The Court similarly rejected the "demand-waiver doctrine" which "provides that a defendant waives any consideration of his right to speedy trial for any period prior to which he had not demanded a trial," pointing out "[a] defendant has no duty to bring himself to trial; the state has that duty as well as the duty of insuring that the trial is consistent with due process" 407 U. S. at 527. *Compare Harris v. State*, 194 Md. 288, 297-98, 71 A. 2d 36, 40 (1950) (decided prior to *Barker v. Wingo*).

Mr. Justice Powell, who delivered the opinion for the majority of the Court, stated:

> "We have shown above that the right to a speedy trial is unique in its uncertainty as to when and under what circumstances it must be asserted or may be deemed waived. But the rule we announce today, which comports with constitutional principles, places the primary burden *on the courts and the prosecutors* to assure that cases are brought to trial. We hardly need add that if delay is attributable to the defendant, then his waiver may be given effect under standard waiver doctrine, the demand rule aside.
>
> "We, therefore, reject both of the inflexible approaches — the fixed-time period because it goes further than the Constitution requires; the demand-waiver rule because it is insensitive to a right which we have deemed fundamental. The *approach we accept is a balancing test,* in which the conduct of both the prosecution and the defendant are weighed [footnote omitted]" 407 U. S. at 529-30. (emphasis added)

In formulating such "balancing test" the four factors enumerated were (a) length of delay, (b) the reason for the delay, (c) the defendant's assertion of his right and (d) prejudice to the defendant.

The length of delay was held by the Court to be the "triggering mechanism" since "[u]ntil there is some delay which is presumptively prejudical there is no necessity for inquiry into the other factors that go into the balance," and since "the length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case." 407 U. S. at 530-31. The Court observed that a "nine months" delay "may be wholly unreasonable under the circumstances." 407 U. S. at 528.

The *Barker* Court noted that "[c]losely related to the length of delay is the reason the government assigns to justify the delay," pointing out as one extreme that "[a] deliberate attempt to delay the trial in order to hamper the defense should be more heavily weighed against the government" while "[a] more neutral reason, such as negligence or over crowded courts should be weighed less heavily, but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." The Court was of the view that a "valid reason, such as a missing witness, should serve to justify appropriate delay" as an example of the opposite extreme.

Although the Supreme Court rejected the "demand-waiver doctrine," as a rigid criterion, it concluded that a defendant's assertion or failure to assert his right to a speedy trial was nonetheless one of the factors to be considered; it held that an assertion of such right "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right," since a "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." 407 U. S. at 531-32.

In discussing the factor of prejudice the Court identified three interests of defendants which the speedy trial right was designed to protect: (i) to prevent oppressive pre-trial incarceration; (ii) to minimize anxiety and concern of the

accused and (iii) to limit the possibility that the defense will be impaired. The Court was of the view that the last of these was the most serious interest "because [of] the inability of a defendant adequately to prepare his case skews the fairness of the entire system;" that prejudice to the defendant "is obvious" if witnesses die or disappear during the delay and that there is equal prejudice if defense witnesses are unable to recall accurately events of the distant past. The Supreme Court additionally pointed out that where the defendant is "locked up" in jail during the interval "he is hindered in his ability to gather evidence to contact witnesses or otherwise prepare his defense." 407 U. S. 532-33.

In connection with the application of the criteria in the "balancing test" Mr. Justice Powell stated further:

"We regard none of the four factors identified above as either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process. [footnote omitted] But, because we are dealing with a fundamental right of the accused, this process must be carried out with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." 407 U. S. at 533.[5]

---

5. In Barker v. Wingo, 407 U. S. 514 (1972), petitioner was not tried upon a charge of murder until more than five years after arrest. His trial was continued sixteen times, initially for the purpose of permitting the trial of Manning, an accomplice, whose testimony was needed to convict Barker. Manning had six trials before his conviction became final; there were subsequent delays because of the illness of a key prosecution witness. Confined to jail for only ten months of the interval, Barker made no objection to the continuances until three-and-one-half years after his arrest. The Supreme Court, applying a "balancing test," in what it characterized as a "close" case, was of the view that the length of delay was "extraordinary" and that only seven months of it could be attributed to a "strong excuse," the illness of the witness. Finding upon the record that "Barker did not want a speedy trial" but was "gambling on Manning's acquittal" concluded that these "counter-balancing factors" outweighed the "deficiencies" in bringing him to trial and held that he had not been denied his constitutional right to a speedy trial by the Commonwealth of Kentucky.

In *Barker v. Wingo,* the Court, while recognizing that a violation of the right to a speedy trial "leads to the unsatisfactorily severe remedy of dismissal of the indictment" with a result that a "defendant who may be guilty of a serious crime may go free without having been tried" nevertheless held that dismissal is the "only possible remedy." 407 U. S. at 522.

The standards enunciated in *Barker* were referred to in *Strunk v. United States,* 412 U. S. 434 (1973), holding that dismissal was "the only possible remedy" where a speedy trial had been denied, and were re-stated in *Moore v. Arizona,* 414 U. S. 25 (1973) in rejecting the view, under the test in *Barker,* that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right.

Antecedent to the holdings in *Barker v. Wingo, supra,* from a massive corpus of case law — in both this Court and in the Court of Special Appeals certain fundamental principles had been thoroughly distilled. Pre-eminent was that the right to a speedy trial is relative and that the time within which trial must be held to satisfy the constitutional guarantee depends on the facts and circumstances of each particular case; that in evaluating those facts and circumstances on a case-by-case basis four factors came into play. They were: (1) the length of the delay, (2) the reason for the delay, (3) prejudice to the accused and (4) waiver by the accused. *See State v. Lawless,* 13 Md. App. 220, 226-27, 283 A. 2d 160, 166 (1972) and cases therein cited at n. 5, 6. Save for the one factor of "waiver by the accused" the standards applied were identical to those later enumerated in *Barker.*

Subsequently, the *Barker-Wingo* "balancing test" and its criteria have been consistently applied by the Court of Special Appeals. *See State v. Hunter,* 16 Md. App. 306, 314-15, 295 A. 2d 779, 783 (1972), pointing out that the Supreme Court in *Barker* had rejected "the rule that a defendant who fails to demand a speedy trial forever waives his right" and had stated that "the better rule is [that] the defendant's assertion of, or failure to assert, his right to a

speedy trial is one of the factors to be considered." *See also State v. Jones*, 18 Md. App. 11, 16-18, 305 A. 2d 177, 180-81 (1973) which noted that "[i]n the first full analysis of the speedy trial right ever undertaken by the Supreme Court, *Barker* ameliorated the foreclosing effect of waiver, in one of its aspects at least," when it rejected the "demand-waiver doctrine" but further observed "that a defendant's conduct which causes delay will not redound to the detriment of the State, whether the result is reached by simply subtracting this time period from the 'delay' factor *ab initio* or by considering it as 'waiver,' by affirmative conduct."

In making our independent constitutional appraisal of whether the appellant was denied his constitutional right to a speedy trial we must under the holding in *Barker v. Wingo* "engage in a difficult and sensitive balancing process" in which "the conduct of both the prosecution and the defendant are weighed" and "considered together with such other circumstances as may be relevant" the four enumerated and related factors. 407 U. S. at 533. Realizing that *Barker* "prescribes 'flexible' standards based on practical considerations," *Strunk v. United States, supra*, at 438, and that the "right to a speedy trial is not a theoretical or abstract one but one rooted in hard reality in the need to have [the] charges promptly exposed" *Dickey v. Florida*, 398 U. S. 30, 37 (1970), we must determine whether the State did "discharge its 'constitutional duty to make a diligent, good-faith effort to bring [Epps] [to trial]'." *Moore v. Arizona, supra*, at 26; *Smith v. Hooey, supra*, at 383.

### (a) *Length of Delay*

For purposes of the right to a "speedy trial," consideration of any delay in bringing the appellant's case to trial requires a computation from the date on which the defendant became "an accused," from the date he was subjected to "actual restraints imposed by arrest and [held] to answer [the] criminal charge" (August 9, 1972) up until the date his case was tried (August 22, 1973). *See United States v. Marion, supra*, at 320; *State v. Hamilton*, 14 Md. App. 582, 586, 287 A. 2d 791, 793-94 (1972); *see also State v. Jones, supra*, at 15-16, 305 A. 2d at 180; *State v. Hunter, supra*.

The appellant, of course, upon being charged "was not entitled to demand an immediate trial," *Jones v. State, supra,* at 610, 217 A. 2d at 374; sufficient time must be allowed for the reasonable preparation of the case on the part of the prosecution and for the orderly processes of the case "because of the many procedural safeguards provided an accused." *United States v. Ewell, supra; State v. Lawless, supra.* For "speedy trial" purposes the delay involved is reckoned only in connection with "the passage of time beyond that which is obviously within the requirements of orderly procedure." *State v. Lawless, supra,* at 230, 283 A. 2d at 169.

In *Barker v. Wingo,* the Supreme Court expressed the view that an interval of nine months "may be wholly unreasonable under the circumstances." 407 U. S. at 528. *See United States v. Butler,* 426 F. 2d 1275, 1277 (1st Cir. 1970), cited in *Barker v. Wingo,* where a delay of nine months was held overly long, absent a good reason, in a case that depended on eye-witness testimony. In *Jones v. State, supra,* this Court applied the constitutional guarantee where there was a delay of nearly ten months in a trial for armed robbery. *See also Caesar v. State,* 10 Md. App. 40, 267 A. 2d 750 (1970) (where there was a delay of twelve months which was occasioned "to meet the convenience of individuals"), and *Barnett v. State,* 8 Md. App. 35, 257 A. 2d 466 (1969) (where a delay of eight months was sufficiently significant to require a remand for further evidentiary findings in connection with the assertion by the appellant that a witness who could substantiate a valid defense had become unàvailable as a result of the delay.)

In *Dickey v. Florida, supra,* Mr. Justice Brennan in his concurring opinion stated:

> "To determine the necessity for governmental delay, it would seem important to consider, on the one hand, the intrinsic importance of reason for the delay, and, on the other, the length of the delay and its potential for prejudice to interests protected by the speedy-trial safeguard. For a trivial objective, almost any delay could be reasonably avoided.

> Similarly, lengthy delay, even in the interest of realizing an important objective, would be suspect." 398 U. S. at 52.

Under the facts here there was an interval between the commencement of Epps' prosecution and the date upon which he was finally tried of one year, 14 days. His claim concerning such delay is clearly not frivolous and it appears to us that the duration of such interval was sufficiently inordinate to constitute a "triggering mechanism" to engage in the "sensitive balancing process" of reviewing the conduct of both the prosecution and the appellant which gave rise to the delay. Although we appreciate that the "length of delay that will provoke such an inquiry is necessarily dependent upon the peculiar circumstances of the case," we think the delay here was sufficiently protracted to be "presumptively prejudicial" and to provoke inquiry into the other interrelated factors which go into the balance. *Barker v. Wingo, supra,* at 530.

#### (b) *Reasons for the Delay*

At the outset we agree with the view expressed by the Court of Special Appeals, and espoused by the appellee, that the delay of two months, nine days caused by the illness of Officer Surratt was attributable to "neutral" causes. It seems to us that the incapacitating illness of the police officer who arrested the appellant and recovered from him property identified as belonging to McNeil was as much a "valid reason" justifying an appropriate delay as that of the "missing witness" within the extremes of the reasons for delay pointed out in *Barker v. Wingo, supra.* Suffice it to say, that the interval of delay caused by the witness' illness and the rescheduling of the trial was unattributable to either the prosecution, to the defendant, or to the courts — it was in our opinion a justifiable delay.

The conclusion that the delay of almost five months between August 9 and December 28, 1972 was "chargeable to the State" has gone unchallenged. *See Davidson v. State,* 18 Md. App. 61, 71, 305 A. 2d 474, 481 (1973).

In view of the facts that the appellant was presented by

the grand jury on September 19th, indicted on September 25th, that counsel was assigned to him by the Public Defender on October 26th and that a pre-trial conference was conducted on December 4, 1972, we do not consider this interval as being either inordinate or beyond that which is obviously within the requirements of orderly procedure.

The critical period in our evaluation of the reasons for delay is the interval between December 28, 1972 and June 12, 1973.

In *Barker v. Wingo*, the Supreme Court did not classify "over-crowded courts" as a "neutral" reason for excusing the delay but only suggested such cause as "[a] *more* neutral reason" than "[a] deliberate attempt to delay the trial in order to hamper the defense," pointing out that "responsibility for such circumstances must rest with the government rather than with the defendant." 407 U. S. at 531. The Court placed "the primary burden on the courts and the prosecutors to assure that cases are brought to trial." 407 U. S. at 529.

Chief Justice Burger in *Strunk v. United States, supra* (where there had been a 10-month delay which was claimed in part to be attributable to the inability of the staff of the United States Attorney to cope with "the rising caseload in his office"), stated:

> "Unintentional delays caused by over-crowded court dockets or understaffed prosecutors are among the factors to be weighed less heavily than intentional delay, calculated to hamper the defense, in determining whether the Sixth Amendment has been violated but, as we noted in *Barker v. Wingo*, 407 U. S. 514, 531 (1972), they must
>
>> 'nevertheless . . . be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.' "
>
> 412 U. S. at 436.

Although initially the onus rests on the prosecution to schedule a defendant's criminal case for trial, the courts

themselves are not excluded from the obligation to give defendants speedy trials. *United States v. Bishton,* 463 F. 2d 887, 890 (D.C. Cir. 1972). *See United States v. Fay,* 505 F. 2d 1037, 1040-41 (1st Cir. 1974), ordering the dismissal of an indictment where there was a nine-month delay between the third date set for trial and the date the defendant was tried, which was not contributed to by the defendant but which stemmed from the inability of the judge having charge of the case to hear it and where in the interval witnesses who had given defense counsel statements could not be located. *See also United States v. DeLeo,* 422 F. 2d 487, 496, (1st Cir. 1970) and *Hodges v. United States,* 408 F. 2d 543, 551-52 (8th Cir. 1969).

In *Jones v. State, supra,* where this Court for the first time ordered the dismissal of indictments for failure to give the appellant a speedy trial, Jones was jointly indicted with others for several armed robberies. Unlike the facts here each defendant wanted a jury trial; the State as here wanted to try them jointly. One of Jones' co-defendants, who pleaded insanity was committed to a state hospital for a pre-trial medical examination.

Arrested on January 8, 1965 Jones through his counsel made a number of attempts to have his case promptly tried. Scheduled for June 16, 1965 it was not "reached" because another jury case was carried over to that day. Except for the June 16th date succeeding delays were caused by a heavy trial docket, the non-attendance of a petit jury panel during the summer recess and the prosecutor's two-week military obligation.

In holding that Jones had been denied his rights to a speedy trial Chief Judge Prescott stated:

"[B]eginning in the latter part of April, we might say almost continuous efforts both to the prosecutor and the trial judge, were made to get the cases tried. No question of unavailability of State's witnesses, or lack of time for preparation by the State, was involved. The only reason he was not tried on June 16 was that another case was started on the preceding day and carried over to June 16.

By this time, appellant's cases called for special attention. Of course, everyone realizes the importance of the trial judges' having every reasonable control over, and latitude in, fixing trial dates for cases to be tried before them. However, *they must heed the mandates of the constitution* relative thereto, as everyone else must. At this stage of the proceedings, the court had a man before it, who had been incarcerated for over 5 months and had made repeated requests, both to the prosecutor and the trial judge, for a recognition of his constitutional right to a speedy trial. The State was prepared for trial and so was the accused. Under these circumstances the prosecutor and the trial judge should have arranged for a very prompt jury trial thereafter. As this Court stated in *Harris v. State, supra,* [194 Md. 288, 71 A. 2d 36 (1950)] "while the State's Attorneys usually prepare criminal dockets, and assign dates for trial of cases, yet the judge can always take control and order a case assigned for trial." See also *State v. Smith,* 89 A. 2d 404 (N. J.).

"This was not done, and the only excuses offered were that the prosecutor would be away, for a time, on summer military encampment, overcrowded trial dockets, and the lack of a jury during summer recess of the courts, the appellant being informed that the earliest date upon which he could obtain a jury trial would be September 15, some 3 months later. The above excuses, under the attendant circumstances, were *not valid ones* in our judgment. As we said above, *when the State indicts a defendant, it must, after his request, try him without undue delay."* 241 Md. at 610-11, 217 A. 2d at 374-75. (emphasis added)

A distillation of the holdings in these cases persuades us that a delay in affording a criminal defendant a "speedy trial" because of over-crowded court dockets and scheduling problems, the responsibility for which rests upon both the

courts and the prosecutors, cannot be classified as wholly "neutral" and must be included within the period of delay in determining whether there has been a denial of this constitutional right. This is particularly true where the defendant has seasonably made known to the trial court his desire to be speedily tried, since a judge "can always take control and order a case assigned for trial," particularly where the assignment for the criminal dockets is controlled by a Criminal Assignment Office, as an agency of the trial court, as it now is in Baltimore City.

On December 28th when Epps appeared before Judge Prendergast he was prepared to go to trial, as was the prosecution. Even though Bea and Evans belatedly then elected trial by jury, Epps, waiving a jury trial, requested that he "be tried today and separately," and that his case be severed. When the judge however yielded to the preference and desires of the prosecutor that the three defendants be tried jointly — patently for a tactical advantage — Epps' rights became inexorably intertwined with those of Bea and Evans who, by their last minute "change of heart" in then electing jury trials, could not be regularly accommodated on the docket for trial until April 13, 1973. His rights to a speedy non-jury trial became firmly attached to the accomplices' rights to jury trials. Epps' request was thereafter to all intents ignored. The delay in the trial of his case, at the request of the prosecution, became purposeful to accommodate the State.

In *United States v. Marion, supra,* the Supreme Court pointed out that it is improper for the prosecution intentionally to delay trials "to gain some tactical advantage over [defendants] or to harass them." 404 U. S. at 325. *See also Pollard v. United States,* 352 U. S. 354, 361 (1957).

While a timely demand for a speedy trial is an important element, the response of the State to such demand is also a matter of prime importance. *Arrant v. Wainwright,* 468 F. 2d 677, 681 (5th Cir. 1972), *cert. denied,* 410 U. S. 947 (1973). When the prosecutor presented his preference to Judge Prendergast and favored the postponing of the case "in its entirety" he recognized the need to have it "reset as quickly

as possible" but apparently took no steps to have the cases treated as other than regularly prayed "run-of-the-mill" jury trials to be reached in due course on the calendar.

Mr. Justice White in his concurring opinion, joined in by Mr. Justice Brennan in *Barker v. Wingo, supra*, after pointing out "those personal factors" in denials of speedy trials such as interference with the defendant's liberty, the disruption of his employment, the drain of his financial resources, the curtailment of his associations, his subjection to public obloquy and the creation of anxiety in him, his family and friends (as delineated in *United States v. Marion, supra*, at 320), stated:

> "But, for those who desire an early trial, these personal factors *should prevail if the only countervailing considerations offered by the State are those connected with crowded dockets and prosecutorial case loads.* A defendant desiring a speedy trial, therefore, should have it within some reasonable time; and only special circumstances presenting a more pressing public need with respect to the case itself should suffice to justify delay." 407 U. S. at 537. (emphasis added)

As was pointed out in *Hodges v. United States, supra*, at 552, and quoted with approval in *United States v. DeLeo, supra*, at 496 and *United States v. Fay, supra*, at 1040, the "press of other business [in the courts] . . . obviously does not serve to toll the enforcement of the right of a defendant awaiting trial on . . . [the] criminal calendar."

Notwithstanding the purposeful delay of three-and-one-half months caused by the coupling of the trial of the appellant's case with the cases of his co-defendants, in order to accommodate the tactical decision of the prosecutor, and the resultant rescheduling of the trials for April 13, 1973 because of the "over-crowded" status of the jury trial docket, we do not, under the circumstances of this case, consider the unavailability of a courtroom on that later date a sufficiently valid excuse for continuing Epps' trial for an even additional and protracted period of 60 days.

The way we view it, the entire period from December 28, 1972 (the date of the initial postponement) until June 12, 1973 (the date of the postponement caused by the witness' illness) was caused by "governmental action" — by both the courts and the prosecutors; none of it may be considered as having been "neutral," none of it certainly is attributable to the appellant.[6] This period of delay resulted solely from the prosecutor's tactical decision to try the defendants jointly and the passive cooperation of the court with no heed being paid to Epps' unequivocal request.

Although there are a few cases involving the rights of a single defendant to a speedy trial, where the prosecution desired a joint trial, which have held, under the particular circumstances in each, that there had been no violation of that defendant's Sixth Amendment right, each of such cases is factually readily distinguishable. *See United States v. Annerino,* 495 F. 2d 1159, 1162-64 (7th Cir. 1974); *United States v. Phillips,* 482 F. 2d 191, 195-96 (8th Cir.) *cert. denied,* 414 U. S. 1114 (1973); *United States v. DiTienne,* 468 F. 2d 151, 156-58 (7th Cir. 1972), *cert. denied,* 410 U. S. 911 (1973); (each of which was decided subsequent to *Barker v. Wingo, supra). See also United States v. Carosiello,* 439 F. 2d 942, 944-45 (3d Cir. 1971) and *Hedgepeth v. United States,* 364 F. 2d 684, 687-89 (D.C. Cir. 1966).

## (c) *Defendant's Assertion of Right*

When counsel for the appellee asserts in its brief that "[a]t no time does the record disclose that the petitioner demanded or requested an early trial until his motion to dismiss, which was filed on June 13, 1973," the oral motion made by Epps on December 28, 1972, that he "be tried today and separately," as set forth in those proceedings, was obviously overlooked. Epps' written motion filed on June 13, 1973 was not a request for a "speedy trial" but was a motion to dismiss the indictment for want of a speedy trial after each of the trials scheduled for him on December 28, 1972,

---

6. Epps was not "the cause of the pause that ensued," *see* Maryland State Bar Assoc., Inc. v. Frank, 272 Md. 528, 534-35, 325 A. 2d 718, 721-22 (1974).

April 13th and June 12, 1973 had been aborted, and came apparently as a result of his frustration.

Since he had "no duty to bring himself to trial," *Barker v. Wingo, supra,* at 527, and since both the prosecutor and the arraignment judge were made aware of his demand, this assertion by him on December 28th became "entitled to strong evidentiary weight in determining whether [he was] being deprived of the right." *Barker v. Wingo, supra,* at 532. He was certainly not seeking "to put off the confrontation as long as possible." *See Dickey v. Florida, supra,* at 37-38.

(d) *Prejudice to the Defendant*

As was pointed out in *Moore v. Arizona, supra,* "an affirmative demonstration of prejudice" is not necessary to prove a denial of the constitutional right to a "speedy trial," 414 U. S. at 26, the Supreme Court there stating in a per curiam opinion:

> "Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay,
>
> > 'wholly aside from possible prejudice to a defense on the merits, may "seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends." *United States v. Marion,* 404 U. S. 307, 320 (1971). [footnotes omitted]
> >
> > These factors are more serious for some than for others, but they are inevitably present in every case to some extent, for every defendant will either be incarcerated pending trial or on bail subject to substantial restrictions on his liberty.' *Barker v. Wingo, supra,* at 537 (White, J., concurring)."

414 U. S. at 26-27.

Although prejudice may be presumed from the inordinate length of the delay itself, *Barker v. Wingo, supra,* at 530; *Strunk v. United States, supra,* at 439, we think upon the facts here, aside from those personal factors enumerated by Mr. Justice White in his concurring opinion in *Barker v. Wingo, supra,* which cause "anxiety and concern", the appellant Epps sustained actual prejudice.

A defendant's freedom on bail and "his ability to gather evidence, contact witnesses, or otherwise prepare his defense" is frequently a significant consideration in determining a lack of prejudice and in holding that there has been no denial of a speedy trial. *See Barker v. Wingo, supra,* at 533; *United States v. Annerino, supra; United States v. Card,* 470 F. 2d 144, 145 (5th Cir. 1972), *cert. denied,* 411 U. S. 917 (1973); *United States v. Merrick,* 464 F. 2d 1087, 1090 (10th Cir.), *cert. denied,* 409 U. S. 1023 (1972); *United States v. Bishton, supra; State v. Murdock,* 235 Md. 116, 124, 200 A. 2d 666, 670 (1964). No such element existed in this case.

Epps was incarcerated in jail, unable to make bail, from the date of his arrest on August 9, 1972 until the date of his trial on August 22, 1973, an interval which we consider, under the circumstances, to have been oppressive. One of the interests which the right was designed to protect was thus defeated.

Additionally the delay created an impairment of his defense. When the case came before the Court on December 28th David Epps was in attendance, apparently prepared to testify that the appellant was not at the scene of the robbery. Some time between that date and the latter part of February 1973 the alibi witness was inducted into the armed forces and was serving in Korea at the time of the trial. Since it was elicited at the trial that McNeil could not identify Epps as one of the perpetrators of the robbery the critical nature of the witness' testimony becomes evident. With the appellant having elected not to testify for fear of impeachment by virtue of his record of prior convictions,[7]

---

7. The appellant testified in the post-trial proceedings on September 14, 1973 that he elected not to testify in his own behalf because of prior convictions for robbery with a deadly weapon in 1966 and for shoplifting in 1971.

David Epps became the only witness in his behalf. Although admittedly speculative, the testimony of David Epps might have been sufficient to have generated a "reasonable doubt" as to his guilt. *See Floyd v. State*, 205 Md. 573, 581, 109 A. 2d 729, 732 (1954).

For all practical purposes, any possible defense which the appellant had was obliterated when by reason of the postponement on December 28th he was denied the opportunity of presenting the testimony of his alibi witness. It seems to us that the appellant has demonstrated not only "the possibility that [his] defense will be impaired," *Barker v. Wingo, supra*, at 532, but has shown, to his prejudice, an actual impairment of his defense.

We cannot agree with the view expressed by the Court of Special Appeals "that Epps could, through appropriate military channels, have taken the deposition of his witness and could have read the same to the jury."

The difficulties inherent in undertaking such a procedure, authorized by Rule 727, under the circumstances, are readily apparent. If the witness was to be deposed pursuant to Rule 409 a the attendance of counsel for both the prosecution and the appellant, at substantial public expense would be required "half a globe away." Alternatively, assuming such procedure to be authorized by military regulations, military counsel in Korea might have been designated to represent both the prosecution and the defense in deposing the witness. This would seem, under the circumstances, to be a most unsatisfactory device. If the witness were to be deposed pursuant to Rule 409 b by interrogatories propounded to him, it is difficult to comprehend how the prosecutor could frame cross-interrogatories to such an alibi witness without knowing the nature of his responses to the direct questions addressed to him. Aside from these mechanical impediments there always remained the possibility of an objection by a joint defendant, under Rule 727 g, to the use of such deposition.

As Judge Orth for the Court of Special Appeals in *Barnett v. State*, 8 Md. App. 35, 41, 257 A. 2d 466, 470 (1969) pointed out: "Certainly, if a witness who could substantiate a valid

defense, and who would have been available but for the delay, became unavailable as the result of the delay, such unavailability would be a most compelling showing of prejudice."

Since it appears that David Epps could have substantiated the only defense the appellant had, his unavailability, as a result of the protracted delay compels a conclusion of prejudice.

From the "difficult and sensitive balancing process" by which we have inquired into each of the interrelated factors delineated in *Barker v. Wingo* and have weighed the conduct of both the prosecution and the defense, we conclude under the facts of this case, that the delay in bringing Epps to trial, caused by the prosecution and concurred in with the passive cooperation of the court, violated the right to a "speedy trial" guaranteed him under both the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights.

Since dismissal of the indictment is the only possible remedy when a speedy trial has been denied, *Barker v. Wingo, supra; Strunk v. United States, supra; Moore v. Arizona, supra,* we are reluctantly constrained, upon constitutional grounds, to conclude that the indictment upon which Epps was convicted must be dismissed.

When the appellant made his proffer in the trial court it seems to us that Judge Watts should have conducted an evidentiary hearing — which was subsequently done in connection with Epps' post-trial motion — and upon the facts as were elicited, have ordered the indictment dismissed.

> *Judgment of the Court of Special Appeals reversed; case remanded to that court with directions that it be further remanded to the Criminal Court of Baltimore with instructions to dismiss the indictment; costs to be paid by the Mayor and City Council of Baltimore.*