# ELIJAH DAVIS *v.* STATE OF MARYLAND

[No. 775, September Term, 1975.]

*Decided July 26, 1976.*

The cause was argued before■ ORTH, C. J. and POWERS and LOWE, JJ.

*James J. Fabian, Assigned Public Defender,* for appellant.

*Bernard A. Raum, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *John Prevas, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

An understanding of the history of this case is helpful to an understanding of the issues we must now decide. The present appeal is the third arising from charges upon which Elijah Davis, the appellant, was arrested in Baltimore in July of 1970. We are now asked to reverse judgments of the Criminal Court of Baltimore against him on two of several indictments returned in August, 1970.

The pertinent charges are that Davis:

1. Unlawfully did possess certain controlled paraphernalia, to wit: 5000 gelatin capsules, which was suitable for the packaging of individual quantities of controlled dangerous substances, in sufficient quantities and under circumstances which reasonably indicate an intention that such controlled paraphernalia be used for the illegal manufacture and distribution of controlled dangerous substances, and

2. Unlawfully did possess a certain controlled dangerous substance of Schedule III, to wit: Phenobarbital.

On 1 February 1972 the Criminal Court of Baltimore, Grady, J., heard and denied a motion by appellant to dismiss five pending indictments against him for lack of a speedy trial. Davis took an immediate appeal from that order. We

entertained the appeal.[1] We affirmed the order denying the motion. We said, in part, in an unreported opinion:

"All of the indictments were filed on 31 August 1970. The appearance of appellant's retained counsel was entered in each case on 11 September 1970. Additional counsel later entered appearances. On 16 September 1970 appellant was arraigned and pleaded not guilty in each case. Motions for discovery were filed in proper person in February 1971. There is nothing to indicate that either appellant's own counsel of record or the State's Attorney's office was ever made aware of these motions. The dockets record no further proceedings until the cases were called for trial on 1 February 1972.

"At that time appellant asked for a court trial; his codefendant elected a jury trial. The court then severed the two cases. After some discussion about discovery, appellant's counsel made a motion to dismiss due to lack of a speedy trial. From the transcript of what followed we glean that appellant asserted that at the time of arraignment he demanded a speedy trial. The transcript of the arraignment shows no such request. He also said he 'put it on the motion when I came back from escape.' It also appears that some time after his arraignment on the charges in this case, appellant was confined under a sentence in another case or cases. Also, he had other indictments pending against him besides those in the record before us.

"Upon his plea of insanity in another unidentified case, he spent some time at the Clifton T. Perkins Hospital. For some period of time his whereabouts were unknown because he had escaped from confinement. His counsel recalled that there had been certain postponements of scheduled trials because appellant was not ready to go to trial. Specifically in August 1971 a scheduled trial was

---

1. Under our later holding in Taylor v. State, 22 Md. App. 370, 323 A. 2d 648 (1974), we would have dismissed the appeal as premature.

postponed because appellant requested a jury.
Appellant testified that in October 1971 his counsel
told him that on February 1st he was going to get
the charges dropped."

After we affirmed the order of the Criminal Court of
Baltimore and remanded the cases for further proceedings,
Davis petitioned the Court of Appeals for a writ of
certiorari. His petition was denied.

The denial of certiorari was noted on the docket of the
Criminal Court of Baltimore on 27 March 1973. In April
appellant in proper person filed motions for a speedy trial,
and to suppress evidence. In June he was notified that his
trial would be held on 25 September 1973. The previous time
the cases had been called for trial, on 1 February 1972,
appellant had accomplished a severance by asking for a
court trial when his codefendant elected a jury trial. The
record indicates that the cases were called on 25 September
1973 as a court trial. Davis then prayed a jury trial. The case
was rescheduled for a jury trial on 25 October 1973. On that
date the case was called before Judge Dorf, on the two
indictments now before us. Davis then waived his right to a
jury, and elected to be tried by the judge. Trial was held on
25, 26 and 29 October 1973.

Judge Dorf found Davis guilty on each of the two charges,
and imposed consecutive sentences of four years on each.
Davis appealed from those judgments. Because of what we
held to be an error in admitting evidence seized in an
automobile search, we reversed both judgments in an
unreported opinion and remanded the case for a new trial.

At the new trial, held before Judge Cardin and a jury
beginning on 13 March 1975, Davis was again found guilty
on each of the two charges. Before the taking of evidence
was commenced Judge Cardin heard and denied a motion to
dismiss the charges for lack of a speedy trial, and a motion
to suppress evidence. After sentences were imposed, Davis
noted the appeal now under consideration. In his brief and
argument here, he presents these questions:

1. Was the Appellant denied a speedy trial and
was he therefore entitled to a dismissal of the
indictments?

2. Was there sufficient probable cause for the issuance of a search warrant?

3. Is the Plain View doctrine inapplicable when searches are conducted beyond the confines of a valid search warrant?

4. Was the evidence of the gelatin capsules insufficient to sustain a conviction under Article 27, Section 287?

## 1. Speedy Trial

Appellant argues this contention in two parts, both of which were presented and argued to Judge Cardin at the trial below. First, he contends that his motion to dismiss the indictments should have been granted because he was not brought to trial within 120 days after his request for final disposition of the indictments.

The record shows, and appellant concedes, that he did not comply with the requirements of Code, Art. 27, § 616S. He asserts, nonetheless, that the principles of the Intrastate Detainer statute should be applied to him. He argues that the Court of Appeals, in *State v. Barnes*, 273 Md. 195, 328 A. 2d 737 (1974),[2] held that § 616S should be liberally construed so as to effectuate its purpose. The liberal construction applied in *State v. Barnes* was to hold that the mailing of two required notices, one by registered mail and one by ordinary mail, both actually received, was sufficient compliance with the requirement that both notices be sent by registered mail. The Court of Appeals went on to say, at 209:

> "We do not suggest, however, that any such liberal construction to effectuate the purposes of the statute should absolve proof by competent evidence of those conditions precedent necessary for bringing the provisions of the statute into play."

There simply was no proof in this case of the necessary

---

**2.** Affirming the judgment of this Court in Barnes v. State, 20 Md. App. 262, 315 A. 2d 117 (1974).

conditions precedent. We cannot construe non-compliance as compliance.

Appellant also argues that the indictments should have been dismissed because he was denied his constitutional right to a speedy trial. The lapse of time to which he points is the period between 27 March 1973, when the docket records the denial of certiorari in his prior appeal, and 25 October 1973, when his trial before Judge Dorf began.

We have examined the record in the light of the principles expressed in *Barker v. Wingo*, 407 U. S. 514, 92 S. Ct. 2182, 33 L.Ed.2d 101 (1972); *Epps v. State*, 276 Md. 96, 345 A. 2d 62 (1975); and other cases there discussed. We have made our independent constitutional appraisal of whether appellant was denied his constitutional right to a speedy trial by this time interval of slightly less than seven months.

We find that under the circumstances of this case the lapse of time was not sufficiently inordinate to constitute a "triggering mechanism" to engage in the "sensitive balancing process" of reviewing the conduct of both the prosecution and the appellant which gave rise to the delay. *Epps v. State*, 276 Md. at 111. We are persuaded that in alternating his elections from time to time between jury trial and court trial, the appellant manipulated his right of election in a fluid strategy designed to frustrate the attempts of the State to bring him to trial. We do not mean to suggest that an accused may not make full use of all procedures available to him, but we do say that he may not complain of the result of his own strategy.

## 2. The Search Warrant

The paraphernalia and the pills, for possession of which appellant was convicted in this case, were seized by police in the course of the execution of a warrant to search appellant's automobile and seize a .45 caliber automatic pistol and 12 gauge shotgun, said to be evidence relating to the commission of a crime pertaining to kidnapping.

Appellant attacks the search warrant because its validity is necessary to the validity of the seizure of the paraphernalia and the pills. He says first that the affidavit

supporting the application for the warrant was not under oath, and second, that the affidavit did not show probable cause for the issuance of the warrant.

It is perfectly clear that the application for the warrant was supported by a sworn statement of facts. The statement, typewritten on a single sheet of Police Department stationery, was signed at the bottom by Lieut. Edwin Boston, who described himself as "Affiant". It was also signed by Judge Joseph G. Finnerty. The application, on a printed form, stated that "the facts tending to establish grounds for issuance of Search Warrant are set forth in the Affidavit attached thereto and made a part thereof", and was signed by Lieut. Edwin Boston as Affiant. A certification, "Sworn to before me and subscribed to in my presence this *12* day of *July, 1970*" was signed by Joseph G. Finnerty, Judge.

The probable cause required to be shown was, of course, that a pistol and a shotgun, alleged to be instrumentalities of the crime of kidnapping, were to be found in Davis's automobile. The facts recited by Lieut. Boston were as reported to him by two kidnap victims, Cynthia Green, a former girl friend of Davis, and Michael Lofton, her male companion. We quote a part of the statement:

" * * * that about 0130 hrs., 12 July 1970, while walking in the alley, rear of the 2800 blk. Parkwood Ave. they were accosted by Cynthia Green's ex-boy friend, Elijah Davis, M/N/23 yrs., 1603 Edmondson Ave., who placed his hand on the front of his shirt, pulling upward and thereby causing the shape of a pistol to appear. Davis then told Miss Green and Mr. Lofton, 'Don't run or I'll shoot you'. Davis then grabbed Miss Green by her arm and while still holding the front of his shirt, ordered 'C'mon out of the alley'. At the intersection of the alley and the 2200 blk. Ruskin Ave. Davis struck Miss Green and after she fell to the ground, kicked her in the stomach. Davis then ordered Miss Green and Mr. Lofton to his 1970 Oldsmobile Convertible Sed. Blue in color, with a white top, Md. Lic. CV 4880, which

was parked at the intersection of Woodbrook Ave. and Whittier Ave. At the car Davis ordered Miss Green and Mr. Lofton to get into the car. Before they entered, however, an accomplice of Davis' removed from the floor of the car, from behind the front seat, a 12 gauge shotgun, which was placed in the trunk of the car. In the car, Davis remarked, 'When I went through the alley looking for Cindy, with that shotgun, everybody ran in their houses.'

"Davis later released Lofton and took Miss Green to 3501 Grantley Rd., where he was later arrested. At the time of his arrest I was advised by Mr. Bernard Morton, 3501 Grantley Rd. that Davis had in the trunk of his auto, a .45 Cal. auto Pistol and a 12 gauge shotgun.

"Information from Miss Green, that while she was dating Davis he always carried a .45 Cal. Auto Pistol under the front of his shirt, and when he did not have it on his person, he would keep same in the trunk of the car. Miss Green stated Davis has pistol whipped her with this gun in the past."

There was no showing of the basis of Bernard Morton's knowledge of what he told Lieut. Boston, but we may ignore that part of the statement as unnecessary surplusage. The basis of knowledge of the victims was obviously first hand. The information they gave showed that it was quite probable that the pistol and the shotgun were in the trunk of the car. They had seen the shotgun placed there. Miss Green knew it was Davis's custom to keep the pistol in the car trunk when it was not on his person.

Coming in a report of a crime by the victims, the information may on that basis be considered "reliable", as an alternative to a showing of the inherent "credibility" of the source. *Aguilar v. Texas*, 378 U. S. 108, 84 S. Ct. 1509, 12 L.Ed.2d 723 (1964); *King v. State*, 16 Md. App. 546, 298 A. 2d 446, *affirmed, sub nom. Mobley v. State*, 270 Md. 76, 310 A. 2d 803 (1973), *cert. denied*, 416 U. S. 975, 94 S. Ct. 2003, 40 L.Ed.2d 564 (1974). See also the concurring opinion in *Dawson v. State*, 14 Md. App. 18, 284 A. 2d 861 (1971).

We hold that the search warrant was validly issued, upon sufficient probable cause.

### 3. The Seizure

Lieut. Boston was commanded by the warrant to search the described automobile, and to seize the pistol and shotgun if found there. He executed the warrant, in the presence of three other police officers and the appellant. When he opened the trunk of the car he saw the shotgun. He also saw a cardboard box with a green label, which he described as "five by eight inches — six inches". He identified the box at the suppression hearing before Judge Cardin. Lieut. Boston testified that when he opened the trunk he saw the box and "that box was labeled five thousand gelatin capsules, and as I remember it had a number of a drug company on it." He said that the label showed that the capsules were "No. 5", which was the size used on the street for the use and packaging of heroin. He testified that he had had experience and training in narcotics cases, and he knew that at that time on the streets of Baltimore City heroin was being packaged in gelatin capsules and sold. He also had prior information that Davis was in narcotic trafficking, and was a lieutenant in an organization. From what he knew and what he saw, Lieut. Boston said, "it occurred to me the probable use of the gelatin capsules." He seized the box. When he opened it he found inside about five thousand empty gelatin capsules.

Not yet having found the pistol, Lieut. Boston proceeded to search further for it. In the trunk was a black briefcase, or attache case. It was a little larger than ten by fifteen inches, large enough to hold a pistol. When he opened the attache case to look for the pistol he saw several ledger books which he said were in a pocket in the lid. He also saw in the attache case what he described as two prescription tablets, with the letters "PD". The officer's words implied that he saw the tablets in plain view when he opened the attache case to look for the pistol. There was no other evidence which negated such an inference. It was Lieut. Boston's "educated guess", from their appearance and the markings on the tablets, and from his experience with pill

cases, that they were prescription drugs of the
phenobarbital variety. He seized the tablets. A subsequent
chemical analysis showed that they were phenobarbital.

Both the box and the tablets were seen by Lieut. Boston,
in plain view, during a valid search, commanded by a valid
warrant. When he seized the box he had probable cause to
believe that it contained controlled paraphernalia. When he
seized the tablets he had probable cause to believe that they
were prescription drugs of the phenobarbital variety. Each
was contraband. His seizure of each was lawful. Each was
admissible in evidence. The motion to suppress them was
properly denied.

It should be made clear that as to each item, probable
cause existed at the time of the seizure. That what the
officer had probable cause to believe turned out to be true,
when the contents of the box were inspected, and when the
tablets were analyzed, is not only unnecessary, but is
irrelevant to the legality of the seizure.

We have said that in a previous appeal we reversed the
judgments against appellant because of error in admitting
the evidence seized in the automobile search. The evidence in
that record did not show probable cause for the seizures. The
difference lies in the source of the evidence. Lieut. Boston
did not testify at the first hearing. The officer who did
testify was present, but was watching Davis. He had neither
the factual knowledge nor the expertise demonstrated by
Lieut. Boston. All he saw was an open box of empty
capsules, and two pills. He did not mention a label on the lid
of the box, nor did he express a belief that the tablets were
prescription drugs. Suffice it to say that the evidence at the
retrial concerning the search and seizure was vastly
different.

## 4. Sufficiency of the Evidence

Appellant argues that it is not illegal per se to possess
gelatin capsules and that there was no evidence that these
capsules were suitable for packaging heroin, or of
circumstances reasonably indicating that it was his

intention to use them for the manufacture or distribution of controlled dangerous substances.

Lieut. Boston testified at the trial on the merits concerning the seizure of the capsules. He said:

> "At that time on the street of Baltimore City gelatin capsules were being used for a packaging device for heroin."

He was asked to describe the process, and said:

> "The heroin, of course, would be cut down many times after it was brought into the country, and at that time it was cut down I believe the normal street value would be that it would be cut to three per cent with quinine mixed with sugar, there were many different devices. However, once cut the heroin is put into capsules and filled up and the cap is replaced, and it was selling at that time for two dollars on the street."

On cross examination he said that he knew of legal uses for gelatin capsules by pharmacists and hospitals, but if he found them under other circumstances it would be questionable.

There was direct evidence of the suitability of the capsules for use in the manufacture or distribution of heroin. The circumstances permitted the trier of the facts to infer that appellant intended such use. *Waller v. State*, 13 Md. App. 615, 284 A. 2d 446 (1971). The evidence was sufficient to support the finding of guilt.

*Judgments affirmed.*